THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FABIAN PICO, Defendant-Appellant.

First District (3rd Division)    No. 1—96—0574

Opinion filed March 31, 1997.

Rita A. Fry, Public Defender, of Chicago (Lindsay Huge, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Veronica X. Calderon, and Nichelle L. Jenkins, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LEAVITT delivered the opinion of the court:

Following a bench trial, the defendant, Fabian Pico, was found guilty of first degree murder on an accountability theory. The trial judge sentenced him to 35 years' imprisonment. The defendant, who was 16 years old at the time of the offense, contends that the trial judge should have suppressed his confession because the police failed to make a reasonable attempt to notify his parents, as required by section 5—6(2) of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/5—6(2) (West 1994)).

On May 30, 1994, John Smith and his brothers, Lawrence and Charles, returned from a fishing trip. During the late evening, they were sitting with their friend, Joe White, on the porch in front of White's house, located at 3237 62nd Street in Chicago. At around 11 p.m., John noticed some members of the "2-6" street gang nearby. One of the gang members, Cricket, who was riding a bicycle, approached the group and was talking with them. Lawrence bet Cricket that he could "catch him on his bike." John watched as Lawrence chased Cricket down the street. Shortly thereafter, shots rang out, and Lawrence came running back. John began running west on 62nd Street, and a man firing a gun chased him. John ran through a gangway toward a fence and climbed it. As he did, he turned his head and saw that the gunman, who had a bandana covering his face, was directly behind him with the gun pointing at his back. John dropped to the ground, apparently on the other side of the fence, and escaped. John then returned to the front of White's house, where he found his brother, Charles, lying dead on the ground.

Lawrence Smith testified to the same effect. He had been sitting at Joe White's house with his brothers, John and Chuck, as well as White. They were drinking beer when, all of a sudden, Lawrence heard gunshots and "some guy" came running from across the street firing a gun. The gunman had a bandana over his face. As the gunman approached, Lawrence dropped to the ground and told the assailant "I am not in a gang." The gunman looked at Lawrence, then turned and headed down a gangway, shooting as he left. After the

shooting was over, the gunman came running back and crossed the street, where another person was waiting for him. The two then fled. Lawrence got up off the ground and saw Chuck walking out of the gangway by White's house. Chuck told Lawrence that he had been shot. Chuck fell to the ground, faceddown. Lawrence approached him, turned him over and saw a bullet hole in his chest.

On May 31, 1994, Dr. Lawrence Coga examined the body of Charles Smith. His stipulated testimony included these findings: Charles Smith suffered a "single penetrating gunshot wound to the chest. No exit wound was identified. That a copper coated bullet was recovered from the left lower back. *** [T]he gunshot wound to the chest, which lacerated the skin, aorta, diafram [sic], spleen and kidney, was the cause of death."

The State and the defendant also stipulated to the testimony of Detective Kenneth Boudreau of the Chicago police department. His testimony had been admitted previously during a hearing on the defendant's motion to suppress his confession. Boudreau testified that on September 10, 1994, he was assigned to Area One Violent Crimes. On that day, he met with the defendant, who at the time had been brought in as a witness who might have information about the death of Charles Smith.

That evening, Detective Boudreau and his partner spoke with the defendant twice. They did not advise him of his *Miranda* rights before the first conversation. Before that discussion, the defendant had informed the police that he was a witness to the shooting. During the questioning, however, it became apparent to Detective Boudreau that the defendant "was culpable, at which time we terminated our interview."

After terminating the interview, Detective Boudreau attempted to telephone the defendant's mother. The defendant supplied the telephone number. Boudreau's effort was unsuccessful. Boudreau acknowledged that the report he filed failed to indicate that he attempted to notify the defendant's parents that the defendant was in custody. In any event, before resuming his questioning, Boudreau summoned a youth officer. When the youth officer arrived, about one hour and 45 minutes later, Boudreau read the defendant his *Miranda* rights. Questioning resumed at this point.

Assistant State's Attorney Kathy Dietz testified that she was also summoned to Area One on September 10, 1994. She arrived there at 11:15 p.m. When she arrived, she spoke with Detective Boudreau and his partner, Detective Halloran. At that time she learned the identity of the defendant and that he was in custody. She met the defendant at 11:45 p.m. and immediately advised him of his *Miranda* rights.

She also read him his rights as a juvenile—that he had the right to have a parent or youth officer present during questioning and that, depending on the charge, he could be tried as an adult. The defendant agreed to speak with Dietz. Juvenile Officer Hall was also present. They spoke for a total of 45 minutes during the next few hours. The defendant was not handcuffed during the interviews.

At approximately 3 a.m., Dietz transcribed the defendant's statement. Dietz identified the defendant in court as the person whose statement she transcribed. After she finished writing the statement, the defendant reviewed, corrected and signed it. The substance of the defendant's statement was as follows.

The defendant had been a member of the Ambrose street gang for three to four years. On May 30, 1994, he was with Ricky, another Ambrose street gang member. The two were at 62nd and St. Louis when they were "jumped" by a group of 2-6ers. The Ambrose street gang and the 2-6 street gang are rivals. The defendant and Ricky decided to seek retaliation, and he stated that they were going to jump the 2-6ers who jumped them earlier if they found them. At one point during the night, they saw the guys who jumped them, but they ran and got away.

The defendant went to a fellow gang member's house, where he met George. George is a 'gunner' for the Ambrose gang, someone who does shooting for the gang. The defendant told George that he and Ricky were jumped by the 2-6ers. George told the defendant that they were going to get even with the 2-6ers for jumping the defendant and Ricky. They would go to 59th and Rockwell. There, the defendant would walk up and down the block to see if any 2-6ers were out. The defendant was supposed to inform George where the 2-6ers were. The defendant would then distract the 2-6ers by "talking shit" to them. Then, George would sneak up and shoot them. Once the shooting was over, George and the defendant would return to George's house. George was going to take care of getting rid of the gun. At this time, George and the defendant left the house.

Later, the defendant and George walked to 62nd and Kedzie. As they were walking, George said "if they are *** out there, let's pop them." George told the defendant he had a gun and that the defendant should watch for police. George then pulled the gun out of his waistband and showed it to the defendant. At that time, the defendant knew that George was going to shoot the 2-6ers as revenge for jumping the defendant and Ricky earlier that day.

The defendant and George approached 62nd Street just west of Kedzie. They did not see any 2-6ers there. So they walked together down 62nd Street. The defendant heard someone yell out "2-6 A K,"

which the defendant knew to be 2-6 gang members yelling out their gang affiliations. "A K" means Ambrose killer. The defendant then saw a group of 2-6ers standing on the other side of the street. The defendant said "Fuck you, T S K" to the 2-6ers. "T S K" means 2-6 killer. At this point, George pulled a bandana up over his face, pulled the gun out of his waistband and started shooting. George shot in the direction of the 2-6ers about three times. George then ran toward them and shot three more times. The defendant and George then ran to George's house.

■ The trial judge found the defendant guilty upon this evidence. The defendant contends that his statement should have been suppressed because the police did not make a reasonable effort to notify his parents that he was in custody, as required by section 5—6(2) of the Act. 705 ILCS 405/5—6(2) (West 1994). Section 5—6(2) states in pertinent part:

"A law enforcement officer who takes a minor into custody without a warrant under Section 5—5 shall, if the minor is not released, immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care ***; and the law enforcement officer shall without unnecessary delay take the minor to the nearest juvenile police officer ***." 705 ILCS 405/5—6(2) (West 1994).

The trial judge denied the defendant's motion to suppress his statement, finding, based on the testimony of Detective Boudreau, that the requirements of section 5—6(2) had been satisfied.

■ Initially, the State contends that section 5—6(2) does not apply to the defendant, because he was in custody as a murder suspect and was, therefore, not a "delinquent minor" who benefits from the protection in the Act. We disagree. Section 5—5 of the Act, to which section 5—6(2) refers, provides that "[a] law enforcement officer may, without a warrant, take into custody a minor *** whom the officer with reasonable cause believes to be a delinquent minor." 705 ILCS 405/5—5(1)(a) (West 1994). Section 5—3(1) of the Act defines "delinquent minor" as "any minor who prior to his 17th birthday has violated *** any *** state law." 705 ILCS 405/5—3(1) (West 1994). The State correctly notes that section 5—4(6)(a) exempts certain minors from the definition of delinquency as set forth in section 5—3; however, we do not believe the language of section 5—4(6)(a) supports the proposition that the defendant was exempt at the time Detective Boudreau began and continued to question him.

Section 5—4(6)(a) states that "[t]he definition of delinquent minor under Section 5—3 of this Act shall not apply to any minor who at the time of an offense was at least 15 years of age *and who is charged*

with first degree murder ***. These charges and all other charges arising out of the same incident shall be prosecuted under the Criminal Code of 1961." (Emphasis added.) 705 ILCS 405/5—4(6)(a) (West 1994). We believe that the plain language of section 5—4(6)(a) indicates that its exemption is triggered only when the minor has been charged. Until that point, the minor retains the protection of the Act. This is the only logical interpretation of section 5—4(6)(a), for until such time as the minor is charged, the State cannot know whether he will be tried pursuant to the Criminal Code as an adult or as a delinquent minor under the Act.

The State relies primarily on the decision in *People v. Sevier*, 230 Ill. App. 3d 1071, 598 N.E.2d 968 (1992), contending that the Act does not apply to a minor who is taken into custody and subsequently charged with murder. In *Sevier*, this court held that police were not required to follow the parallel provisions of the former Juvenile Court Act (Ill. Rev. Stat. 1983, ch. 37, par. 701—1 *et seq.*) requiring both parental notification and the presence of a juvenile officer during custodial interrogation of a 16-year-old murder suspect. The court reasoned that the defendant had been arrested because of his suspected involvement in the murder "and not because of a juvenile court violation." *Sevier*, 230 Ill. App. 3d at 1084. In reaching this result, the court in *Sevier* relied on *People v. Visnack*, 135 Ill. App. 3d 113, 481 N.E.2d 744 (1985); however, in *Visnack*, the defendant was apparently already 17 years old at the time he committed murder. Accordingly, he was simply not subject to the terms of the Juvenile Court Act (see Ill. Rev. Stat. 1979, ch. 37, par. 702—7), and the court so held. *Visnack*, 135 Ill. App. 3d at 126.

We consider the holding in *Sevier* to constitute an unfounded application of the holding in *Visnack* to minors under age 17 who clearly fall within the ambit of the Act's protection. *Cf. People v. Cole*, 168 Ill. App. 3d 172, 179, 522 N.E.2d 635 (1988) (recognizing that the former Juvenile Court Act required police to attempt to notify parents that their child, who was being interrogated in a murder case, was in custody). Accordingly, we hold that under section 5—4(6)(a), a minor being held in custody pursuant to section 5—5 does not lose the protection of the Act until such time as he is charged with one of the section 5—4(6)(a) offenses. In this case, the defendant was not charged with murder at the time he was being questioned. That being the case, he was nothing more than a possible delinquent minor at the time he was questioned. Therefore, section 5—6(2) of the Act applied and required that the police attempt to notify the defendant's parents.

■ That having been said, we will not disturb the trial judge's

ruling denying a motion to suppress a defendant's statement unless it is against the manifest weight of the evidence. *People v. Brown*, 182 Ill. App. 3d 1046, 1051, 538 N.E.2d 909 (1989).

Relying on *People v. McGhee*, 154 Ill. App. 3d 232, 507 N.E.2d 33 (1987), the defendant contends that Detective Boudreau's single attempt to phone his parents was not a reasonable attempt to notify under the statute, rendering his statement involuntary. In *McGhee*, a police officer left a business card with the defendant's uncle at the time the officer took the defendant into custody. Without analysis, the court simply stated this was an insufficient attempt to notify the defendant's mother. *McGhee*, 154 Ill. App. 3d at 236. Nonetheless, the court affirmed the denial of the defendant's motion to suppress his confession on fourth amendment grounds because violation of the statute did not constitute a *per se* constitutional violation.

Here, the defendant concedes that a violation of section 5—6(2)'s notification procedures does not, in and of itself, render his confession involuntary. Rather, he acknowledges that a violation is merely a part of the totality of the circumstances that a court must examine to determine whether the statement is freely given. See *Brown*, 182 Ill. App. 3d at 1052. Aside from the alleged violation of the notification procedures in the statute, the defendant offers no ground upon which his statement should have been suppressed. Thus, in essence, the defendant has challenged the voluntariness of his confession premised solely upon an alleged violation of the Act, a challenge he has implicitly conceded has no merit.

We note that, during the defendant's interrogation, a youth officer was present, as required by section 5—6(2). Furthermore, no allegation of coercion, abuse or other circumstance that would undermine the voluntary nature of the statement has been asserted by the defendant. To the contrary, the defendant received appropriate *Miranda* warnings, was not handcuffed, received beverages and was offered food. His statement acknowledged that he had been treated well by the police and Assistant State's Attorney Dietz. The totality of the circumstances supports a finding that the defendant's confession was voluntarily made. For these reasons, we affirm the denial of the defendant's motion to suppress his statement.

■ The defendant also contends that the 35-year prison sentence imposed by the trial judge was excessive, "considering [his] youth in terms of his rehabilitative potential and his limited intent and involvement in the shooting." In support of his argument, the defendant cites cases in which a reviewing court determined to reduce a sentence imposed on a relatively youthful offender.

A trial judge may sentence a defendant convicted of first degree

murder to a term of imprisonment ranging between 20 and 60 years. 730 ILCS 5/5—8—1(a)(1) (West 1994). The length of a sentence is a matter largely within the discretion of the trial judge. *People v. Illgen*, 145 Ill. 2d 353, 379, 583 N.E.2d 515 (1991). We will not disturb a sentence if, as here, it is within the statutory guidelines unless the trial judge relied upon improper factors in imposing the sentence. *People v. Strader*, 278 Ill. App. 3d 876, 663 N.E.2d 511 (1996).

Contrary to his assertion, the defendant was an active participant in the murder of Charles Smith. Charles Smith was an innocent bystander to a street gang feud. The record in aggravation established that Smith was engaged to be married and was the father of three young children. The defendant had a significant history of criminal conduct as a juvenile. He had also continued his gang activity while in custody during the pendency of his trial. As a result, the trial judge concluded that the defendant had little remorse for his actions, although the judge did consider the defendant's statement during the sentencing hearing. Under the circumstances, we cannot conclude that the judge abused his discretion.

Affirmed.

GORDON and CAHILL, JJ., concur.