THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LYJUAN MORGAN, Defendant-Appellant.

First District (6th Division)   No. 1—97—2304

Opinion filed June 30, 1999.

618

Law Offices of Kevin Milner, of Palatine (Kevin Milner, of counsel), and Law Offices of Leonard C. Goodman, of Chicago (Leonard C. Goodman, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Alan J. Spellberg, and Lisette Mojica, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINN delivered the opinion of the court:

Defendant, Lyjuan Morgan, was tried before a jury and convicted of first degree murder and sentenced to 40 years' imprisonment. On appeal, defendant argues that: (1) the trial court abused its discretion in denying defendant's motion to suppress his confession; (2) the trial court erred in ruling that defendant did not establish a *prima facie*

case of racial discrimination in the State's exercise of peremptory challenges to excuse two black venirepersons from the jury; (3) the State failed to prove defendant guilty beyond a reasonable doubt; (4) the State committed prosecutorial misconduct when it stated in closing arguments that its witness failed to identify defendant out of fear of gang retaliation; and (5) defendant's sentence was excessive. For the reasons discussed below, we affirm defendant's conviction and sentence.

On June 28, 1996, Kenneth Muhammed was murdered at 85th and Bishop Streets. On July 19, 1996, a complaint for preliminary examination was approved by an assistant State's Attorney and a warrant was issued for defendant's arrest for the murder.

At the time of the murder, defendant was 16 years old. He lived with his mother and sister in an apartment near 86th and Ashland Avenue. He had dropped out of high school after his freshman year. Defendant had one finding of juvenile delinquency for burglary to an auto and possession of a stolen motor vehicle.

On July 21, 1996, at about 2:10 p.m., defendant was arrested on an unrelated disorderly conduct charge. He was taken to the youth office in the 20th District, where the outstanding murder warrant was discovered. Defendant was then transported to Area Two. Defendant was formally arrested at 5 p.m. on July 21, 1996, and later gave a statement confessing to the murder.

The following facts surrounding the circumstances of defendant's confession were adduced at defendant's motion to suppress his statement.

Officer D. Barker testified that on July 21, 1996, at approximately 2:10 p.m, he arrested defendant for disorderly conduct and took him to the 20th District police station for processing. Because defendant was a juvenile, Officer Barker called the Area Three youth division, where defendant was transported and told by a youth officer that he was wanted on a warrant. At that point, defendant was handcuffed to the wall.

Officer Edward Kaup testified that on July 21, 1996, he transported defendant from Area Three's youth office to Area Two. Officer Kaup informed defendant that he was taking him to Area Two because detectives wanted to speak to him. Defendant did not complain that his handcuffs were too tight. Officer Kaup testified that no one threatened defendant with any kind of physical harm. At Area Two, Officer Kaup turned defendant over to Detective James Boylan.

Detective Boylan testified that he took defendant into custody at 5 p.m. on July 21, 1996. He removed defendant's handcuffs and placed him in an interview room. Defendant did not complain to Detective

Boylan that his handcuffs were too tight. Detective Boylan asked defendant for his mother's name and phone number and attempted to contact his mother. Defendant did not ask to speak with his mother or an attorney. A police report contained the name of defendant's father, Craig Harding, but defendant did not provide Detective Boylan with any information about his father's whereabouts. Detective Boylan then attempted to contact several witnesses to the shooting.

By about 8 or 8:30 p.m., Detective Boylan was still unsuccessful at contacting the witnesses and called for an assistant State's Attorney. Detective Boylan gave defendant hamburgers, french fries, and a Coke. At approximately 9:15 p.m., Assistant State's Attorney Eric Lifvendahl arrived.

Detective Boylan made further attempts to contact defendant's mother and finally reached her at 9:50 p.m. Detective Boylan informed Mrs. Morgan that defendant had been arrested for murder and asked her if she wanted to be transported to the police station to be present during defendant's questioning. Mrs. Morgan replied that she had high blood pressure and could not make the trip. Mrs. Morgan did not ask to speak with defendant. Detective Boylan did not offer defendant an opportunity to make any phone calls, and defendant did not ask to make any phone calls. Detective Boylan gave defendant an opportunity to use the restroom, offered him something to drink, and then again attempted to contact witnesses in order to conduct a lineup. Detective Boylan testified that he had not begun questioning defendant at that time.

Detective Boylan then contacted Area Two youth division, and youth officer Fagan was assigned to defendant's case. At about 10 p.m., Boylan, Assistant State's Attorney Lifvendahl and youth officer Fagan entered the interview room where defendant sat handcuffed. Detective Boylan introduced Lifvendahl and youth officer Fagan to defendant. Lifvendahl advised defendant of his *Miranda* rights and informed him that he was a lawyer working with the police, and not his attorney, and that, due to the nature of the offense, he would be tried as an adult. Detective Boylan testified that no one verbally threatened defendant with any type of harm and that no one pushed or shoved him.

On cross-examination, Detective Boylan admitted that he was aware that the arrest warrant commanded that defendant be brought before a judge.

Assistant State's Attorney Lifvendahl testified that youth officer Fagan introduced himself as a youth officer and told defendant that he would act as a responsible adult for him. Youth officer Fagan also told defendant that if he had any questions or wanted to know anything

before he answered a question, he could ask him. Detective Boylan told defendant that his mother told him she was suffering from high blood pressure and could not come to the station. Defendant stated that he was aware of his mother's condition.

Assistant State's Attorney Lifvendahl then advised defendant of his *Miranda* rights, and defendant stated that he understood those rights. Lifvendahl asked defendant if he wished to answer questions. Defendant agreed to do so. Defendant was then questioned by Detective Boylan and Assistant State's Attorney Lifvendahl, with youth officer Fagan present, and gave an oral statement admitting to the shooting. This conversation lasted approximately 20 minutes. While waiting for the court reporter to arrive, Lifvendahl spoke to defendant alone and asked how he had been treated by the police. Defendant responded that there was nothing he wanted to tell him. At 11:10 p.m., defendant gave a court-reported statement confessing to the murder, which he later reviewed and signed. Boylan and Fagan were present as Lifvendahl questioned defendant. In the court-reported statement, defendant stated that the police and the assistant State's Attorney treated him "pretty good," and that no one made any promises or threats to him in order for him to give his statement. Lifvendahl read each line out loud as defendant sat next to him and read along. Some corrections were made to the statement. Boylan, Fagan, and defendant initialed these corrections and they also signed the bottom of each page.

Defendant testified that on July 21, 1996, in the area of 5042 North Winthrop, the police arrested him and his friends and put the handcuffs on him "real tight." Defendant asked one of the officers to loosen his handcuffs, but he did not respond. Defendant also testified that the police banged defendant's and his friends' heads against the hood of the car. Defendant testified that he and his friends were all put in a room with several detectives and handcuffed to the wall. A police officer took defendant upstairs to a youth officer, who asked him his age and attempted to call defendant's mother at work. The youth officer then discovered the warrant for Muhammed's murder and informed Officer Kaup.

Defendant testified that Officer Kaup came in and asked him whom he had killed. Defendant did not respond. Officer Kaup then told him that he could shoot him if he ran because the charge was for murder. Defendant testified that no one advised him of his *Miranda* rights or of his right to have a parent or attorney present for questioning.

Defendant testified that he was then transported to another police station and locked in a little room, where he remained for four hours

and fell asleep. Then Detective Boylan came in alone and, without informing him of his *Miranda* rights, asked him if he wanted to make a statement. Defendant testified that he said, "no, I don't want to say anything." Detective Boylan then gave defendant a folder with statements from people who were claiming that defendant killed Kenneth Muhammed, and pictures of the people who made the statements. Defendant testified that Detective Boylan told him to tell the police what happened and that he would then ask the judge to go easy on him. Detective Boylan later returned with the youth officer and asked defendant to make a statement. Defendant testified that the youth officer did not say anything to him and that Detective Boylan did all the talking. Defendant testified that he was never told that his mother was on the phone. Detective Boylan, the assistant State's Attorney, and the youth officer then transferred defendant to a larger room where he was questioned with a court reporter present, and defendant gave his statement.

On cross-examination at the hearing, defendant admitted that he had heard the *Miranda* rights a "couple times" before his arrest for the murder, and had contact with youth officers a couple of times before and knew that youth officers work with the police and process juveniles. Defendant testified that the assistant State's Attorney read him his *Miranda* rights and that he stated he understood those rights. The assistant State's Attorney had asked defendant whether he had heard those rights read before, and defendant stated that he had.

The parties then stipulated that on July 18, 1996, Detective J. McCann contacted Assistant State's Attorney Kevin Golden, who reviewed the investigative file regarding the murder and approved the issuance of defendant's arrest warrant and a complaint for preliminary examination. These were later signed by a judge.

After hearing this evidence and arguments on the motion, the trial court denied the motion to suppress defendant's statement.

The court found that the presence of a youth officer satisfied the requirements of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1 *et seq.* (West 1994)). The trial court also found that the police did not conspire to interrogate defendant outside the presence of a concerned parent in violation of the Act. The trial court found that Detective Boylan acted responsibly when he attempted to contact defendant's mother and, when she would not come in, contacted a youth officer. The court found that defendant was in custody for less than nine hours and that he was questioned for a very short period of time during that time. The court further found that there was absolutely no physical or psychological force or mental coercion used against defendant. The trial court specifically stated that it did not believe

defendant's testimony that he asked for an attorney or that he stated he did not want to talk. The trial court found that defendant agreed to waive his right to remain silent and talk to the police. The trial court ruled that, under the totality of circumstances, defendant's statement was voluntary and admissible at trial.

At trial, the victim's grandfather, James Barber, testified that on June 28, 1996, Kenneth Muhammed drove to his home at 8557 South Loomis Boulevard in Chicago from Madison, Wisconsin, where he lived with his mother. Muhammed ate and then told Barber that he was out of gas. Barber gave Muhammed $5, and Muhammed took a gas can out of his trunk and went to buy gas. About 15 minutes later, someone came and told Barber that Muhammed had been shot. A police officer also came and informed Barber that Muhammed had died. Muhammed was 17 years old.

Two members of defendant's street gang, the Blackstones, testified for the State, Antonio Sanders and Rico Wilson.

At the time of trial, Sanders was 15 years old. Sanders testified that he was a nonranking member of the Blackstone street gang. On the day of the shooting, Sanders attended a gang meeting, or "service," with seven or eight fellow gang members, including defendant. The meeting took place at Foster Park at 85th and Laflin at approximately 7 p.m. Kevin Gardner and another Blackstone ranking member named "Muggy" were in charge of the meeting. Gardner collected dues. After the meeting, Muhammed walked past them carrying a gas can, heading east on 85th Street. Muhammed's hat was tilted to the right, which meant that he was a member of the Gangster Disciples, a rival gang. He identified himself as "Kenny G" and displayed a pitchfork, the Gangster Disciple's sign. Gardner said, "Let's scrape him" and told defendant to "go get the gun." Sanders testified that the phrase, "let's scrape him," meant to beat someone up. Defendant then rode off on a bike. Sanders testified that he walked away from the scene and, about five or seven minutes later, heard four or five gunshots. The gunshots came from approximately 86th Street. Sanders testified that the police came to his house on July 18, 1996, and took him and his mother to the police station for questioning. Sanders told the police nicknames of people who were at the gang meeting. On cross-examination, Sanders admitted that he made pretrial statements to the police in which he failed to mention that Gardner sent defendant to get a gun or that he saw defendant ride off on a bike.

Wilson testified that he was a member of the Blackstones at the time of the shooting. Wilson did not go to the gang meeting on June 28 and did not witness the shooting. However, Wilson testified that de-

624

fendant admitted that he shot a rival gang member during a conversation Wilson had with him three or four days after the shooting. Only Wilson and defendant were present. Defendant asked Wilson if he heard what defendant did and Wilson said he had heard about the shooting. Defendant then told Wilson how he killed Muhammed. Wilson testified:

> "He told me when he was coming from service they approached the boy, asked him who he was. He said he was kenny G [*sic*] and threw up the fork ***. He said that Kevin and Muggy told him to go get the gun ***. He said when he got the gun he shot at the boy, *** the gun jammed and he shot the boy again ***. He told me he ran home, changed his clothes, took his braids out and came back and watched the boy bleed."

Wilson testified that defendant told him he had used "his black .25," which he kept in the garage in the dog food, and that defendant had shown him this gun on a prior occasion. Wilson also testified that defendant had told him that he was on the bicycle when he came back to the scene from his house and that he got off the bicycle to chase Muhammed. Approximately 20 minutes after this conversation with defendant, Wilson spoke with police officers from the 6th District, and he also met with the police the next day and took them to defendant's garage. He then went with the police to Area Two, where he spoke to Detective Fillipiak.

Yvonne Redeaux, a resident in the neighborhood where the murder took place, also testified. Redeaux lived near 85th Street and Bishop. About 7:30 p.m. on June 28, Redeaux heard five or six gunshots. She ran to her front door and saw three males on the other side of the street. Redeaux testified that one was jogging with a gas can in his hand, and the other two individuals were behind him laughing. Redeaux testified that one of these two boys had "something up his t-shirt" and "had a cap and he either had a ponytail or braids from the cap." However, Redeaux could not identify defendant.

Officer David Heard testified that he and his partner arrived at the scene of the shooting at approximately 8 p.m. The victim was lying facedown, and there was blood on the ground. They canvassed the area looking for bullet shells on 86th Street, where the victim was lying, but not on Bishop. They recovered a white T-shirt and a bicycle from the scene of the crime. Heard brought the bicycle to the 6th District police station and summoned an evidence technician to inventory and lift fingerprints from the bicycle.

Detective William Fillipiak testified that he arrived at the scene at about 8:30 p.m. He was informed that the shooting probably took place at 8531 South Bishop and went to that address, where he saw a

shirt in the parkway. He was informed that Muhammed had been chased by two or three black males, starting at 86th and Bishop. Muhammed dropped his gas can between the alley and Loomis, and then collapsed. Using his flashlight, Fillipiak searched for shell casings along with other officers and evidence technicians, but did not find any. Detective Fillipiak testified that a shell casing would have been ejected with each shot if an automatic weapon had been used. He canvassed the neighborhood in an attempt to locate witnesses and spoke to Redeaux at her home.

Officer Shaun Barkstrom testified that on July 21, 1996, in the area of 5042 North Winthrop and Argyle, at approximately 2:10 p.m., he arrested defendant for disorderly conduct and took him to the police station, where they turned him over to youth officers to transfer him to Area Two.

Detective Boylan and Assistant State's Attorney Lifvendahl testified in the same manner as they had at the motion to suppress.

At trial, Lifvendahl published defendant's statement to the jury. In the statement, defendant admitted to shooting Muhammed. Defendant stated that he was in the Blackstones street gang and was a "foot soldier," not holding any title or rank. After the meeting on June 28, 1996, everyone left except for defendant, Gardner, Wilson, and three other individuals named Marcus, Torey, and "Muggie." Defendant stated that an individual carrying a gas can walked past them. Gardner yelled, "who are you?" The individual said his name was Kenny G. and "threw up the fork," meaning he displayed a fork sign with his hand, pointing upward. Defendant stated that members of the Gangster Disciples street gang use this sign and that the Gangster Disciples were enemies of defendant's gang. Gardner told defendant to go to the alley and get the gun. Defendant stated that he went to the alley on his bicycle and retrieved a .25-caliber automatic gun that belonged to the gang. Defendant had put the gun underneath the garbage can that morning. Defendant removed the clip to see how many bullets were in the gun. There were five bullets in the clip and one in the chamber. He checked the gun's safety lock, which was off. He then put the clip back inside the gun, got back on his bicycle, and rode toward Bishop. When defendant arrived, he saw Gardner and Muggie pointing at Kenny G. Defendant stated that he jumped off his bicycle, ran up to Kenny G., and started shooting at him. At first Kenny G. looked back at him, but then he looked straight ahead. Defendant stated that he fired the gun six times at Kenny G.'s back. Defendant then gave the gun to Gardner, ran home to his mother's house, took off his clothes and went to sleep.

Defendant further stated that the day after the shooting he spoke

to Gardner and Muggie about the murder. Defendant asked them if Kenny G. got shot, and they replied that he had and that he had died. Defendant then asked them what they did with the gun, and they replied that they broke it up and threw it into the sewer. They told defendant to get out of town. Defendant left the South Side and went to the North Side, because he did not want to get caught by the police.

Defendant stated that the police treated him "[p]retty good" while he was at the station. He also stated that he was treated "[p]retty good" by Lifvendahl. Defendant stated that he ate some hamburgers and chips and drank two sodas, used the bathroom and smoked cigarettes while he was at the station. Defendant stated that no one made any promises to him or threatened him in order to make him talk. Defendant also stated that he was not under the influence of drugs or alcohol.

Dr. Barry Lifshultz, a Cook County medical examiner, testified that he examined the victim's body. There were injuries to Muhammed's face, including an abrasion of the skin on both his right and left cheeks, consistent with Muhammed having fallen on his face. Dr. Lifchultz determined that he was shot six times, four shots in his back, one to his buttocks, and one to his right elbow. Dr. Lifshultz recovered the bullets from Muhammed's body and concluded the injuries were consistent with Muhammed trying to run away from someone. In Dr. Lifshultz's opinion, Muhammed could have run for approximately half a block and turned a corner before he collapsed.

It was stipulated that the State's firearm expert, Richard Fournier, would testify that the bullets recovered from the victim's body were .25 caliber. Fournier could not determine whether the bullets were fired from a revolver or from a semiautomatic pistol.

Officer Mark Harvey, an evidence technician, testified that he lifted five fingerprints from the bicycle's handlebars, one fingerprint from the cross-bar, and one fingerprint from the tube connecting the seat to the sprocket. Officer Harvey then submitted this evidence to the Chicago Police Crime Lab.

John Waitman, an expert in the field of latent fingerprint examination, testified that he examined the latent prints from the bicycle. Two prints from the handlebar of the bicycle were suitable for comparison, one fingerprint and one palmprint. Neither of these prints belonged to defendant. Waitman then ran the fingerprints in the computerized Automated Fingerprint Identification System (AFIS) to be compared with criminals' fingerprints on file and all Chicago police officers. Neither print was a match. Waitman also testified that a person does not leave a latent fingerprint every time he touches an object.

The defense called two witnesses: Detective Fillipiak and Linda Hart.

Detective Fillipiak testified that he interviewed Rico Wilson in July 1996 and that Wilson stated the following to him:

"He basically explained to me that Lyjuan had gone home, got the gun. He was riding his bike. And he came back, *** the victim was being chased by a couple of other people. Lyjuan on his bike is now taking up the pursuit. They turn onto Bishop. Lyjuan starts firing his weapon at the victim, and continues to fire. The way he explained it to me is as he's firing the weapon—he fires the weapon, jumps off the bike, chases the victim a little bit more, fires some more until the gun is empty. The defendant then takes his shirt off and leaves the scene."

Linda Hart lived near the scene of the shooting. She testified that on June 28, 1996, she heard shots, looked out her window and saw two boys walking together southbound on Bishop. One individual was wearing a white T-shirt with red shorts, and the other individual was wearing a white T-shirt with black shorts. One boy was dark complected, and the other boy was medium complected. Hart testified that she saw them only for one second and did not see their faces.

After hearing final arguments, the jury returned a guilty verdict.

Defendant was sentenced on May 22, 1997. The court denied defendant's motion for a new trial on the same date. The trial court heard counsel's argument in aggravation and mitigation, and reviewed the presentence investigation report. The court sentenced defendant to 40 years' imprisonment. The court denied defendant's motion to reconsider sentence.

Defendant first argues that the trial court erred in denying his motion to suppress his statement. Defendant argues that the police violated the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1 et seq. (West 1994)), because they did not satisfy the notice requirement under the Act by simply notifying his mother, and that he was questioned outside the presence of a youth officer, and thus his statement was involuntarily given.

■ The Act provides, in relevant part:

"§ 5—6. Duty of officer; admissions by minor. (1) A law enforcement officer who takes a minor into custody with a warrant shall immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been taken into custody and where he or she is being held; and the officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for such purposes in the county of venue or shall surrender the minor to a juvenile police officer in the city or village where the offense is alleged to have been committed.

The minor shall be delivered without unnecessary delay to the court or to the place designated by rule or order of court for the reception of minors.

(2) A law enforcement officer who takes a minor into custody without a warrant under Section 5—5 shall, if the minor is not released, immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been taken into custody and where the minor is being held; and the law enforcement officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for such purposes in the county of venue or shall surrender the minor to a juvenile police officer in the city or village where the offense is alleged to have been committed." 705 ILCS 405/5—6 (West 1994).

■ We must first determine whether section 5—6(1) applies to the defendant, because at the time he was interviewed by the authorities he had already been charged with murder and, therefore, may not have been a "delinquent minor" who benefits from the protection of the Act. Proceedings may be instituted under the Juvenile Court Act regarding "boys and girls who are delinquent as defined in Section 5—3." 705 ILCS 405/5—1 (West 1994). Section 5—3 defines a "delinquent minor" as "any minor who prior to his 17th birthday has violated or attempted to violate, regardless of where the act occurred, any federal or state law or municipal ordinance." 705 ILCS 405/5—3(1) (West 1994). However, section 5—4(6)(a) provides an exemption where minors will not be protected by the Juvenile Court Act:

"The definition of delinquent minor under Section 5—3 of this Act shall not apply to any minor who at the time of an offense was at least 15 years of age and who is charged with first degree murder ***. These charges and all other charges arising out of the same incident shall be prosecuted under the Criminal Code of 1961." 705 ILCS 405/5—4(6)(a) (West 1994).

The case law has made it clear that where a minor is either arrested without a warrant, or brought into custody for questioning, and then later charged with murder, the Act will apply. In *People v. McGhee*, 154 Ill. App. 3d 232 (1987), the 16-year-old defendant was arrested without a warrant and ultimately convicted of first degree murder. This court applied the Juvenile Court Act. See *McGhee*, 154 Ill. App. 3d at 236. In *People v. Montanez*, 273 Ill. App. 3d 844 (1995), the 15-year-old defendant was also arrested without a warrant. 273 Ill. App. 3d at 848. This court applied the Act and held that there was no reasonable notice given to the defendant's mother. *Montanez*, 273 Ill. App. 3d at 850-52. The purpose of the notice requirement under the Act is to allow, where possible, a parent to confer with and counsel a

juvenile before an interrogation and confession. *Montanez*, 273 Ill. App. 3d at 850.

In *People v. Pico*, 287 Ill. App. 3d 607 (1997), this court analyzed the language of section 5—4(6)(a) and held that the exemptions from protections afforded by the Juvenile Court Act are not triggered until a juvenile is charged with one of the enumerated offenses. *Pico*, 287 Ill. App. 3d at 611-12. In *Pico*, the defendant, a 16 year old, was initially brought to the police station as a witness who may have had information regarding the murder of the victim. *Pico*, 287 Ill. App. 3d at 609. Upon questioning by a detective, however, it became apparent that the defendant was culpable, at which time the detective terminated the interview and attempted to notify the defendant's mother and summoned a youth officer. *Pico*, 287 Ill. App. 3d at 609-10. This court held that the Act applied because the defendant was not yet charged with murder at the time he was questioned. *Pico*, 287 Ill. App. 3d at 612. The court reasoned that "the plain language of section 5—4(6)(a) indicates that its exemption is triggered only when the minor has been charged. Until that point, the minor retains the protection of the Act. This is the only logical interpretation of section 5—4(6)(a), for until such time as the minor is charged, the State cannot know whether he will be tried pursuant to the Criminal Code as an adult or as a delinquent minor under the Act." *Pico*, 287 Ill. App. 3d at 612.

■ Here, defendant was 16 years old at the time of the offense and thus fulfills the first requirement of section 5—4(6)(a). A complaint was filed on July 19, 1996, the same day the warrant was issued, which was before defendant was picked up and arrested on July 22. The complaint alleged that defendant committed the offense of first degree murder and was signed by Detective J. McCann. It was stipulated that prior to presenting the complaint to the judge in circuit court, on July 18, 1996, Assistant State's Attorney Kevin Golden reviewed the investigative file and approved the issuance of defendant's arrest warrant and the complaint for preliminary examination. Based on these facts, we find that defendant was charged with first degree murder at the time he was transported to Area 2 and, therefore, the protections of the Juvenile Court Act did not apply to defendant. See *Pico*, 287 Ill. App. 3d 607.

While we find that the protections of the Act do not apply pursuant to section 5—4(6)(a), we hold that courts must still consider whether such a juvenile defendant's confession is voluntary in light of the extensive body of case law applicable to confessions made by juveniles.

■ Confessions made by juveniles are generally subject to the

same scrutiny as confessions of adult defendants regarding voluntariness. *In re V.L.T.*, 292 Ill. App. 3d 728, 736 (1997). The test is whether, under the totality of the circumstances, the statement was made freely, without compulsion or inducement, with consideration given to the characteristics of the accused as well as the details of the interrogation. *In re Lashun H.*, 284 Ill. App. 3d 545, 550 (1996). Factors to be considered in determining whether the confession was voluntary include defendant's age, education, intelligence, experience and physical condition; the length and intensity of the interrogation; the existence of any threats, promises, or physical coercion; whether the confession was induced by police deception; and whether defendant was informed of his constitutional rights. *People v. Oaks*, 169 Ill. 2d 409, 446-47 (1996). These factors are the same for both minors and adults. *People v. Johnson*, 236 Ill. App. 3d 125, 133 (1992).

■ However, additional factors come into play where a juvenile's confession is concerned, including the time of day when questioning occurred and the presence of a parent or other adult interested in the juvenile's welfare. *People v. McNeal*, 298 Ill. App. 3d 379, 391 (1998). When juveniles are unaided by counsel, great care "must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *In re Gault*, 387 U.S. 1, 55, 18 L. Ed. 2d 527, 561, 87 S. Ct. 1428, 1458 (1967). A trial court's finding that a juvenile's confession was voluntary will not be overturned by a reviewing court unless it is against the manifest weight of the evidence. *People v. Fuller*, 292 Ill. App. 3d 651, 665 (1997).

The benchmark for voluntariness is not whether the defendant would have confessed in the absence of interrogation but, rather, whether the defendant's will was overborne at the time of the confession. *People v. Brown*, 169 Ill. 2d 132, 144 (1996). Each case must be evaluated based on its own particular set of circumstances. *People v. Bernasco*, 138 Ill. 2d 349 (1990).

■ Here, the record shows that there was no coercion involved when defendant gave his statement to the police. Defendant was immediately taken to a youth officer upon the discovery of the warrant for his arrest. Detective Boylan attempted numerous times to contact his mother. Defendant's mother rejected Detective Boylan's offer for her to be driven to the station to be present for her son's questioning. Before defendant was questioned, youth officer Fagan explained his role and told defendant to ask him if he had any questions. Defendant was given food and beverages. Moreover, defendant acknowledged that Detective Boylan and the assistant State's Attorney treated him

"pretty good." Assistant State's Attorney Lifvendahl told Detective Boylan and youth officer Fagan to get out of the room and asked defendant whether there was anything defendant wanted to say about the way the police treated him, and defendant replied there was nothing to tell. Defendant was appropriately "Mirandized" and advised he would be tried as an adult and was not threatened or coerced in any manner. Defendant was familiar with his *Miranda* rights, having heard the *Miranda* warning before. Furthermore, defendant was not physically or mentally disabled, nor under the influence of any controlled substances.

These factors support the trial court's finding that defendant's confession was voluntary. Our deference to the trial court's findings under the manifest weight of the evidence standard extends to its resolution of conflicting testimony and to its choice of competing reasonable inferences that may be drawn. *V.L.T.*, 292 Ill. App. 3d at 736.

■ Defendant next argues that the trial court erred in ruling that defendant did not establish a *prima facie* case of discrimination in the State's exercise of peremptory challenges to exclude two African-American venirepersons, Barbara Boyd and Beverly Miller.

In *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), the United States Supreme Court established a three-step process for evaluating a claim that the State unlawfully discriminated in the selection of a jury. First, the defendant must establish a *prima facie* case of purposeful discrimination in the selection of the jury. Second, if the defendant establishes a *prima facie* case, the burden shifts to the State to articulate a race-neutral reason for challenging each of the venirepersons in question. Third, the trial court must consider those explanations and determine whether the defendant has met his burden of establishing purposeful discrimination. *Batson*, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89, 106 S. Ct. at 1723-24. See *People v. Williams*, 173 Ill. 2d 48, 71, 670 N.E.2d 638 (1996), *cert. denied*, 520 U.S. 1122, 137 L. Ed. 2d 339, 117 S. Ct. 1260 (1997) (outlining factors to consider in determining whether *prima facie* case is shown). A trial court's determination that a defendant has failed to establish a *prima facie* case of discrimination is a finding of fact that will not be overturned on review unless it is against the manifest weight of the evidence. *People v. Hooper*, 133 Ill. 2d 469, 504 (1989).

In its ruling, the trial court noted that it, and not the State, had conducted *voir dire*; that defendant, the victim, the occurrence witnesses, and many of the police officers were African-American; and that Boyd and Miller shared a common characteristic other than race, in that Boyd's brother had been incarcerated and Miller's son had been charged with a crime. Boyd told the court her brother pled guilty

to a narcotics-related charge, and Boyd stated that she was dissatisfied with "what happened in jail" to her brother. Miller stated to the trial court in chambers that, in her opinion, her deceased son was wrongly accused of child molestation and that, although the charges were dropped, the ordeal still bothered her. We find that the trial court's ruling was not against the manifest weight of the evidence.

■ Defendant next contends that he was not proven guilty beyond a reasonable doubt. A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of defendant's guilt. *People v. Strickland*, 154 Ill. 2d 489, 521 (1992). On review, the relevant question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). A reviewing court should apply this standard regardless of whether the evidence is direct or circumstantial, and should not substitute its judgment for that of the finder of fact on questions involving the weight of the evidence or the credibility of witnesses. *People v. Sutherland*, 155 Ill. 2d 1, 17 (1992). Applying this standard to the facts of this case, we find that defendant was proven guilty beyond a reasonable doubt.

■ Defendant next argues that the State committed reversible error during rebuttal argument when the prosecutor made the following comment regarding the fact that Redeaux did not identify defendant:

"You saw the way she looked at him. And the way she had to make a decision about making an identification in this courtroom when I said is that the guy. She lives in that neighborhood. Who controls the park? Who controls Foster Park?"

In this case, the record shows that the prosecutor's remarks were in response to defense counsel's closing argument, during which he commented on Redeaux's failure to identify defendant in the following manner:

"Now, the real people who lived there, you heard Ms. Hart, Ms. Redeaux, they didn't point over there and say this is the guy they saw on the street. They didn't say this was the guy that was out there shooting. The only thing you had, Antonio, Rico and this piece of paper [*sic*]."

Here, the trial court sustained defense counsel's objection and properly instructed the jury that closing arguments are not evidence. The acts of sustaining an objection and properly admonishing the jury are usually viewed as sufficient to cure any prejudice. *People v. Moore*,

171 Ill. 2d 74, 105-06 (1996). The record shows that defendant was not prejudiced by this isolated reference in the State's rebuttal argument.

■ Finally, defendant argues that his sentence of 40 years' imprisonment was excessive, considering his youth and lack of an adult criminal history, and that the court failed to consider defendant's potential for rehabilitation. A trial judge may sentence a defendant convicted of first degree murder to a term of imprisonment ranging between 20 and 60 years. 730 ILCS 5/5—8—1(a)(1) (West 1994). The length of a sentence is a matter largely within the discretion of the trial judge. *People v. Illgen*, 145 Ill. 2d 353, 379 (1991); *Pico*, 287 Ill. App. 3d at 614. The trial court's determination will not be disturbed absent a showing of abuse of discretion (*People v. Perruquet*, 68 Ill. 2d 149, 154 (1977); *People v. Holmes*, 272 Ill. App. 3d 1047, 1059 (1995)), or unless the trial judge relied on improper factors in imposing the sentence (*Pico*, 287 Ill. App. 3d at 614). Where mitigation evidence is before the trial court, the trial court is presumed to have considered the evidence absent some indication, other than the sentence imposed, to the contrary. *Holmes*, 272 Ill. App. 3d at 1059. Here, the sentence of 40 years is within the statutory range, and there is no indication that the trial court relied on any improper factors in sentencing.

Defendant also argues that the trial court failed to consider the factor in mitigation under the sentencing code that defendant's criminal conduct was "induced or facilitated by someone other than the defendant." 730 ILCS 5/5—5—3.1(a)(5) (West 1994). However, the record shows that the trial court took the mitigating factors into account, concluded that defendant acted alone to commit the murder, and concluded that the severity and brutality of the crime, combined with the need to deter others, necessitated the sentence imposed, in spite of defendant's youth. The sentencing court did not abuse its discretion in this case.

For the above-stated reasons, we affirm defendant's conviction and sentence.

Affirmed.

CAMPBELL, P.J., and BUCKLEY, J., concur.