2025 IL App (1st) 221601

FIRST DISTRICT
SECOND DIVISION
March 25, 2025

No. 1-22-1601

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 16291 |
| | ) | |
| EMILIO CHAVEZ, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices McBride and Howse concurred in the judgment and opinion.

**OPINION**

¶ 1 Seventeen-year-old defendant Emilio Chavez arranged to buy cannabis from Joshua Rayborn. The would-be transaction turned violent, and by defendant's own admission, he fatally shot Rayborn and walked away with about $2,000 worth of Rayborn's cannabis. A jury rejected defendant's claim that Rayborn tried to rob *him*, rather than the other way around, and convicted defendant of first degree murder, on a theory of felony murder predicated on armed robbery.

¶ 2 Defendant raises four appellate issues. First, he argues that his custodial statement should have been suppressed, because the police failed to read him the simplified version of the *Miranda* warnings our legislature has required for "minors" and then went on to use deceptive tactics of "minimization" and "maximization" on a youthful suspect. Second, he says, his statement was the fruit of a warrantless arrest that violated the Illinois Constitution. Third, he

alleges that the trial court erred in excluding several "violent and frightening" posts that defendant claims to have seen in Rayborn's Instagram feed before the shooting, which he claims were relevant for various evidentiary purposes. Finally, defendant argues that the trial court improperly considered the proceeds from the armed robbery as "compensation" for the offense, within the meaning of this statutory aggravating factor. We affirm defendant's conviction and sentence.

¶ 3                                    BACKGROUND

¶ 4                                         I

¶ 5      Rayborn was shot and killed on September 18, 2017. A janitor by day and former rap artist known as "Rate YK," Rayborn moonlit as a cannabis supplier to high-school students and other small-time dealers. Rayborn would arrange to meet his customers in the hallway of his apartment building, where he lived with his wife and two young children.

¶ 6      One such customer was defendant, then a 17-year-old high-school senior with a thriving business selling cannabis, in small parcels, to his fellow students. A classmate named Dionte Flowers, who also did business with Rayborn, had recently introduced him to defendant, who was looking for a new source. By all accounts, the arrangement started off well: defendant's first two transactions with Rayborn went smoothly, and Rayborn's product was a hit with defendant's customers. So defendant contacted Rayborn directly, bypassing Flowers, to arrange a third, and this time larger, purchase—three-quarters of a pound of cannabis for $2,050. But this transaction left Rayborn with a fatal gunshot wound to his chest.

¶ 7     There were no eyewitnesses to the shooting, other than defendant himself, but Rayborn's wife, Odemaris, did hear an apparent gunshot and an ensuing struggle. Odemaris testified that her husband took a call around 11 p.m. on the night of the shooting and then stepped out of their apartment to "serve" a customer. Odemaris knew that her husband sold cannabis in the hallway of the building. On this particular occasion, she did not see him with any cannabis as he stepped out, but then again, she was busy in the kitchen making him something to eat. A couple minutes later, by her estimate, she heard a loud noise in the hallway followed by "scuffling." She looked out into the hallway and saw her husband lying against the wall, moaning in distress.

¶ 8     In addition to the gunshot wound, Rayborn had abrasions on his nose and forehead, two lacerations on his right hand, and injuries to his knees. The assistant medical examiner concluded that his injuries were consistent with a "terminal fall," meaning one that occurred at or near the time of death.

¶ 9     Defendant also showed signs of a scuffle. On the morning after the shooting, he picked up his then-girlfriend, Alexandra Mora, on the way to school. Several years later, long after they had parted ways, Mora would recall at trial that defendant had bruises on the left side of his face and near his eye and some scrapes and scratches on his back.

¶ 10                                        II

¶ 11    A drug deal gone bad. That much seemed evident from the start. But how and why, and at whose hand? Odemaris was the first to notice what would turn out to be the most significant item of physical evidence. When she looked out into the hallway, she saw what she described as "half of a gun" on the floor, which the police then recovered from the stairwell of the building.

¶ 12    More specifically, it was the "bottom half," meaning the handle and the trigger, of a 9-millimeter semiautomatic handgun. Somehow, the gun had been broken into several component pieces. The disconnected recoil spring was separately found at the crime scene. But the slide and barrel were missing. When defendant was arrested and interrogated a month after the shooting, he told the detectives that the slide and barrel were in the glove compartment of his car. The police searched the car and found them.

¶ 13    The most telling fact about this gun was the location of the fingerprints. Not surprisingly, there were no prints on the handle or, for that matter, anywhere on the exterior of the gun. But the magazine was loaded into the handle, with live rounds, and locked into place when the police found it. And there were two prints on the magazine itself. One print was matched to defendant. Having achieved that result, the latent print examiner from the Illinois State Police (ISP) did not test the second print, pursuant to what she described as ISP's "deferral policy."

¶ 14    A firearms examiner, testifying at trial, confirmed the obvious: it is not possible to touch the magazine, where the prints were found, when it is loaded into the handle. The examiner also reassembled the gun and determined that there was nothing "loose" about the magazine or the release button that would cause the magazine to slip out by accident or happenstance—a claim, as we will soon see, that defendant would go on to make.

¶ 15    Among the other items found at the crime scene were several live 9-millimeter cartridges, as well as one spent cartridge that, according to forensic analysis, was fired from the broken-down gun; pieces of a cell phone; Rayborn's flip-flop sandals; and an apparent bullet hole in the wall. The police did not find any money or cannabis at the scene.

¶ 16    Along with the slide and barrel of the gun, the search of defendant's car, a month after the shooting, yielded more live 9-millimeter cartridges, another cartridge fired from this same gun, two glass jars containing cannabis, $1,130 in cash, and a plastic bag with defendant's blood-stained clothing and shoes. A DNA swab of the shoes revealed a major profile that was a likely match for Rayborn. Additional swabs of these items and Rayborn's fingernails included mixtures of DNA that could not be identified.

¶ 17                                    III

¶ 18    As noted, defendant was arrested and interrogated exactly one month after the shooting. That was the day after his eighteenth birthday. According to the detectives, it was also the day they received the results of the fingerprint analysis—the key piece of evidence that, in their view, established probable cause for the arrest. Until then, all they knew was that defendant had arranged to buy cannabis from Rayborn and that he was at the scene of the shooting. They knew this from his cell-phone records and communications with Rayborn. But since he later admitted he was present, and indeed that he shot Rayborn, we won't belabor the details of this evidence.

¶ 19    We will return to the details of defendant's custodial interrogation and shifting accounts of events in due course. For now, suffice it to say that defendant admitted that he shot Rayborn. And by the end of the interrogation, he reluctantly conceded the detectives' theory that he did so while robbing Rayborn of his cannabis.

¶ 20    Armed with this evidence, the State charged defendant on theories of intentional, strong-probability, and felony murder. Defendant gave notice that he would claim self-defense at trial.

The State then dismissed the intentional and strong-probability murder counts. So the sole charge presented to the jury was felony murder, predicated on armed robbery.

¶ 21    The decision to drop the intentional and strong-probability counts and rely solely on felony murder precluded defendant's claim of self-defense (which is not a defense to felony murder) and rendered the defense's proposed *Lynch* evidence (which requires a self-defense theory) irrelevant and inadmissible. See *People v. Lynch*, 104 Ill. 2d 194 (1984). But self-defense aside, the defense theory at trial remained that defendant had no plans of robbing Rayborn of his cannabis, resulting in his death; rather, defendant resorted to force for the purpose of defending himself, after Rayborn tried to rob *him* of his money.

¶ 22                                    IV

¶ 23    Defendant's custodial statement was introduced at trial through the testimony of Chicago police detective Jeff Edwards, who interrogated defendant along with his partner, Detective Brian Daly. A redacted video was also published to the jury. What follows is a brief sketch of defendant's evolving account of the shooting.

¶ 24    Defendant began by admitting that he had purchased cannabis from Rayborn. But only once, he said—with Flowers present, and without any violence transpiring. Over the course of the interrogation, the detectives confronted defendant with the text messages he exchanged with Rayborn and, more importantly, his fingerprint on the loaded magazine. After a time, defendant admitted that he had gone back to Rayborn, alone, to buy more cannabis.

¶ 25    This time, defendant claimed, he gave Rayborn the money, but instead of giving him the cannabis, Rayborn pulled out a gun and said, "leave." Defendant lunged at Rayborn, got hold of

the gun during their struggle, and shot Rayborn. Defendant said he had no idea how his prints got on the magazine. Pressed further on this point, he added that the magazine "fell out" during the tussle, and that Rayborn tried "putting it back in." Somehow, defendant's own print must have wound up on the magazine at that time.

¶ 26    This story might make some sense, the detectives said, if defendant's prints were on the outside of the gun. But they were on the magazine, which was securely loaded into the handle. So it seemed far more likely that defendant was the one who loaded the magazine into the gun. For this and other reasons, it would "make more sense" if defendant went to Rayborn, loaded gun in hand—perhaps to commit a robbery, or worse yet, a murder.

¶ 27    Defendant held fast to his story, and the detectives continued to reject it as implausible. Eventually, defendant admitted that he "[j]ust tried to rob him I guess." Defendant, as he now conceded, walked in, pointed the gun at Rayborn, and said something like "give me your shit." Rayborn charged at defendant, and they fought over the gun. Defendant shot Rayborn because he "got nervous" and "tweaked." He grabbed the cannabis and the top piece of the gun, which had since fallen apart, and ran out. Defendant never meant to kill Rayborn. Nor did he plan the robbery in advance; it was a last-minute decision.

¶ 28                                      V

¶ 29    When defendant took the stand at trial, he recanted his admission that he robbed Rayborn and reverted to his earlier claim that Rayborn tried to rob him. But the details, on this version of the story, were different from what defendant told the police.

¶ 30    By way of background, defendant gave an overview of his cannabis business during his

senior year of high school and his introduction to Rayborn through Flowers. Defendant testified that he bought a gun, a black 9-millimeter, from a friend about a year before the shooting. He knew it was illegal for him to have one at that age, but he "just thought it was cool to have one," and he figured that he might also need it for protection. The magazine was loaded into the handle, with live ammunition, when he bought the gun. Before the shooting, defendant had fired the gun once, for fun, at some railroad tracks on the Fourth of July. When he pulled the slide on that occasion, the gun jammed three times, and that's where the bullets in his car came from. Other than that, defendant just kept the gun in his car—for protection, as he reiterated, when he was alone and making larger cannabis purchases.

¶ 31 So when defendant arrived at Rayborn's building, shortly before 11 p.m. on the night of the shooting, he put his gun into his backpack, along with the money for the arranged purchase. Defendant demonstrated how he wore his backpack in front of him, on his chest, rather than on his back. Defendant went inside, where the lighting was dim, and a sign said that surveillance cameras were in use. (Unbeknownst to defendant, the sign turned out to be a decoy, apparently meant to deter intruders.) Defendant went up the stairs to the first-floor landing. Rayborn came down from the second floor and joined him. Defendant did not see Rayborn carrying anything. And Rayborn did not respond when defendant greeted him.

¶ 32 Still, defendant proceeded with his end of the transaction. He opened his bag and handed Rayborn the money. He left his bag open, expecting Rayborn to hand him the cannabis. Instead, Rayborn told him to leave and said that he was "beat," which defendant understood to mean that Rayborn was taking his money and not giving him any cannabis in return.

¶ 33 Defendant tried to grab his money back, but Rayborn blocked his hand, pushed him aside, and started punching him in the face. Defendant fell and landed with his back against the wall. Rayborn—a grown man and a large one at that—got on top of defendant, punched him some more, and grabbed his throat. Defendant managed to stick his thumbs in Rayborn's eyes, causing him to fall back. But try as he might, defendant was unable to stand up; Rayborn, on the other hand, was soon back on his feet and coming for defendant once again. Defendant grabbed his gun from his backpack and shot Rayborn from about four feet away.

¶ 34 Rayborn fell back. Thinking he might be dead, defendant took a few steps toward him, but Rayborn got to his feet and tackled defendant into the wall. They struggled over the gun and tumbled from the first-floor landing into the vestibule. Defendant noticed that the magazine had dislodged a bit, so he pushed it back in; what's more, the top half of the gun was now missing. Defendant hit Rayborn, who was still on top of him, with the bottom part of the gun. When Rayborn finally let go, defendant tossed the bottom half of the gun aside. He picked up the money, his school identification, and the top half of the gun, which was near these other items. Defendant ran back to his car, cleaned himself up at a friend's house, and headed home.

¶ 35 Defendant put his bloody clothes in the trunk of his car and placed the slide and barrel of the gun in his glove compartment. Defendant changed his phone number and remained mum about the incident, both before and after learning, in due course, that Rayborn had died. Defendant did these things, he testified, not to hide evidence, but because he was scared and did not know what else to do. He did, however, continue to sell cannabis.

¶ 36 Defendant testified that he was tired and scared when he told the police, untruthfully, that

he robbed Rayborn. Defendant had turned 18 the day before his arrest and interrogation, and he had been partying all night, smoking cannabis with his cousin until 4 or 5 a.m. He did not get any sleep before going to school the next day. By the time he was taken to the station, he had not slept in over 24 hours.

¶ 37    Defendant acknowledged that he lied about any number of things in his statement to the police, often because he thought the detectives would not believe him if he told the truth. But most importantly, he thought the detectives were trying to help him. For example, they told him several times (as the electronically recorded interrogation (ERI) confirms) that a robbery was "explainable," while a cold, calculated murder was not. And that is why defendant falsely conceded their theory that this was a robbery gone awry. Or so he testified. The jury, needless to say, did not believe him.

¶ 38                                    VI

¶ 39    Because defendant was not yet 18 when he committed the offenses, the trial court duly considered the *Miller* factors, recognized that the firearm enhancement was discretionary, and sentenced defendant to 37 years in prison. See *Miller v. Alabama*, 567 U.S. 460 (2012); 730 ILCS 5/5-4.5-105(a), (e) (West 2020).

¶ 40                                 ANALYSIS

¶ 41                                     I

¶ 42    Defendant argues that the trial court erred in denying his motion to suppress his custodial statement, in which he alleged a violation of his *Miranda* rights. Defendant's youthful age looms large in his suppression argument in two ways. First, he argues that the detectives were required,

but failed, to administer the simplified *Miranda* warnings made available for "minors" under state law. Second, he argues that his *Miranda* waiver was invalid because the detectives, after failing to administer the juvenile warnings, went on to use deceptive tactics of "minimization" and "maximization" on a youthful suspect.

¶ 43                                    A

¶ 44     We must first decide, as a threshold matter, whether defendant was entitled to the simplified version of *Miranda* warnings provided in state law for juvenile offenders. It is undisputed that the officers did not provide defendant with these simplified *Miranda* warnings. As Detective Daly testified, Detective Edwards read defendant his "adult rights." The dispute here, instead, concerns one of statutory interpretation. So our review is *de novo*. *People v. Clark*, 2024 IL 130364, ¶ 15.

¶ 45     Our task in interpreting a statute is to "ascertain" and "give effect" to the legislature's intent. *Id.* The best indicator of that intent is the statutory language itself, "given its plain and ordinary meaning." *Id.* So we "look first" to the plain language of the statute. *People v. Lane*, 2023 IL 128269, ¶ 10. If the language of a statute is clear and unambiguous, we must apply it as written, without resort to extrinsic sources to determine legislative intent. *Whitaker v. Wedbush Securities, Inc.*, 2020 IL 124792, ¶ 16.

¶ 46     The simplified juvenile *Miranda* provisions appear, verbatim identical, in the Code of Criminal Procedure of 1963 and in the Juvenile Court Act of 1987. See 725 ILCS 5/103-2.1(a-5) (West 2020); 705 ILCS 405/5-401.5(a-5) (West 2020). They became law simultaneously, passed in the same public act in 2016. See Pub. Act 99-882, §§ 10, 15 (eff. Jan. 1, 2017).

¶ 47 These provisions contain warnings that mirror *Miranda* but in more accessible language (*e.g.*, " 'you do not have to say anything' "; " 'You have the right to stop this interview at any time.' " 725 ILCS 5/103-2.1(a-5)(1) (West 2020); 705 ILCS 405/5-401.5(a-5) (West 2020)). They must be given in their entirety without interruption, followed by the questions, " 'Do you want a lawyer?' " and " 'Do you want to talk to me?' " 725 ILCS 5/103-2.1(a-5)(2)(A), (B) (West 2020); 705 ILCS 405/5-401.5(a-5) (West 2020).

¶ 48 Most notably for our purposes, the warnings must be given to any "minor, who at the time of the commission of the offense was under 18 years of age, *** while the minor is subject to custodial interrogation by a law enforcement officer." 725 ILCS 5/103-2.1(a-5) (West 2020); 705 ILCS 405/5-401.5(a-5) (West 2020). There is no debate the "minor" must have been under age 18 at the time he committed the alleged offense; the statutes say that quite clearly. But what about the minor's age *at the time of the custodial interrogation*? By using the word "minor," did the General Assembly mean an individual under the age of 18 at the time of the custodial interrogation or under the age of 21? The State says under 18; defendant says under 21.

¶ 49 That matters here, of course, because while defendant was interrogated about a crime that occurred when he was under 18, his custodial interrogation began the day *after* he turned 18. So the statutory age cutoff makes all the difference in whether defendant was entitled to these simplified warnings.

¶ 50 One would think, at first blush, that we could analyze this question under either version of the warnings, the one found in the Juvenile Court Act or the one in the Code of Criminal Procedure. The provisions are identical, after all, and they were enacted at the same time in the

same public act, leading to a presumption that the legislature intended them to have identical interpretations. See *Arnold v. Board of Trustees of the County Employees' Annuity & Benefit Fund of Cook County*, 84 Ill. 2d 57, 62 (1981); *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 373 Ill. App. 3d 866, 869 (2007); *In re S.P.*, 323 Ill. App. 3d 352, 357 (2001).

¶ 51   The complicating factor, however, is that one statutory scheme leaves us with a clear answer, the other one far less so. The word "minor" is expressly defined in the relevant article of the Juvenile Court Act, answering the question for us quite clearly (in defendant's favor), while the Code of Criminal Procedure contains no definition anywhere of the word "minor."

¶ 52   We ordered supplemental briefing on the interplay between these two provisions. For reasons we detail below, we agree with defendant that the Juvenile Court Act governed the custodial interrogation here, as defendant had not yet been charged with a crime placing him under the jurisdiction of the criminal courts. And the Juvenile Court Act unambiguously defines a "minor" as an individual under the age of 21 for purposes of the simplified *Miranda* warnings. Defendant, who was 18 at the time of the custodial interrogation, was entitled to the simplified *Miranda* warnings for juvenile suspects.

¶ 53                                                   1

¶ 54   We begin with our determination that the Juvenile Court Act, not the Code of Criminal Procedure, governed the custodial interrogation here. Generally speaking, an individual charged with a crime committed while he was under the age of 18 is subject to the "exclusive" jurisdiction of the Juvenile Court Act. 705 ILCS 405/5-120 (West 2020) (subject to specified exceptions, "no minor who was under 18 years of age at the time of the alleged offense may be

- 13 -

prosecuted under the criminal laws of this State"). There are four exceptions to the rule of exclusive juvenile-court jurisdiction listed in section 5-120. The first does not advance our conversation much, involving violations of traffic, boating, or wildlife laws or municipal or county ordinances. See *id.* § 5-125.

¶ 55    The remaining exceptions to the rule of exclusive juvenile-court jurisdiction—that is, the instances when a minor may be tried as an adult in criminal court—are referred to as "transfers" to criminal court. The most serious crimes, when committed by minors of age 16 or 17, are statutorily "excluded" from juvenile-court jurisdiction, what we often call "automatic transfer" crimes. See *id.* § 5-130. Those transfers are automatically triggered when the State "charges" the defendant with the crime. *Id.* § 5-130(1)(a) (juvenile-court jurisdiction does not attach "to any minor who at the time of an offense was at least 16 years of age *and who is charged with*" first-degree murder and other serious offenses" (emphasis added)).

¶ 56    Other transfers are not automatic. Depending on the gravity of the charged offense and the age and background of the juvenile, these transfers may be "presumptive transfers" (*id.* § 5-805(2)), "discretionary transfers" (*id.* § 5-805(3)), or "extended jurisdiction juvenile" transfers (*id.* § 5-810(1)). In each of these non-automatic transfers, the State may seek a transfer by petition at any time before trial, and the court must decide whether to grant the petition. See *id.* §§ 5-805(2)(a), (3)(a), 5-810(1)(a).

¶ 57    We lay this out to emphasize that, regardless of which transfer applies in a given case, there is a fixed point in time in which that transfer occurs. The transfer from juvenile to criminal court is not triggered unless and until either the State charges a defendant (for an automatic

transfer) or the court grants the State's petition (for any other transfer).

¶ 58     Here, defendant was ultimately charged with first-degree murder allegedly committed when he was 17, which would qualify as an "excluded jurisdiction" crime and thus an automatic transfer to criminal court. See *id.* § 5-130(1)(a). But defendant remained under the jurisdiction of the Juvenile Court Act until the very moment that he was "*charged with* *** first degree murder.*" (Emphasis added.) *Id.*

¶ 59     We have previously recognized the charging of the offense as the triggering moment dividing juvenile-court jurisdiction from that of criminal courts in automatic-transfer cases. See *People v. Pico*, 287 Ill. App. 3d 607, 612 (1997) ("Until that point" that minor was charged with automatic-transfer crime, minor "retain[ed] the protection of the [Juvenile Court] Act."); *People v. Plummer*, 306 Ill. App. 3d 574, 583-84 (1999) ("We agree with the analysis and holding of *Pico* and adopt it," and thus "a minor being held in custody *** does not lose the protection of the Juvenile Court Act until such time as he is charged with one of the offenses enumerated in [automatic-transfer statute]."); *People v. Morgan*, 306 Ill. App. 3d 616, 629 (1999) (agreeing with but distinguishing *Pico*, as minor in *Morgan* "was charged with first degree murder at the time he was transported to Area 2 and, therefore, the protections of the Juvenile Court Act did not apply to defendant" when he was interrogated post-charging).

¶ 60     Each of these decisions above concerned minors who (as here) were ultimately charged with first-degree murder, an automatic-transfer offense given their ages. In each case, they complained that law enforcement had failed to make a reasonable effort to notify their parents that they were in custody, as required by the Juvenile Court Act, and thus their confessions

should be suppressed. In each case, the State argued that, because they were suspects in automatic-transfer crimes and were, in fact, ultimately charged with such crimes, the Juvenile Court Act was inapplicable. In each case, we rejected the State's position and adopted the reasoning first articulated in *Pico*, 287 Ill. App. 3d at 612:

> "[T]he plain language of [the automatic-transfer provision] indicates that its exemption is triggered only when the minor has been charged. Until that point, the minor retains the protection of the Act. This is the only logical interpretation of [the automatic-transfer provision], for until such time as the minor is charged, the State cannot know whether he will be tried pursuant to the Criminal Code as an adult or as a delinquent minor under the Act."

See *Plummer*, 306 Ill. App. 3d at 583-84; *Morgan*, 306 Ill. App. 3d at 629.

¶ 61    In both *Pico* and *Plummer*, the minor had not yet been charged at the time of the custodial interrogation, and thus the parental-notification provision in the Juvenile Court Act applied. *Pico*, 287 Ill. App. 3d at 612; *Plummer*, 306 Ill. App. 3d at 583-84. In *Morgan*, 306 Ill. App. 3d at 629, the minor had already been charged with the automatic-transfer crime of first-degree murder at the time of his custodial interrogation, so while we agreed with the holding in *Pico*, "the protections of the Juvenile Court Act did not apply to defendant" when interrogated.

¶ 62    We fully agree with this line of decisions. The automatic-transfer provision in section 5-130 is not self-executing. A minor is not transferred to criminal court until that minor "is charged with" a qualifying offense, in this case first-degree murder. 705 ILCS 405/5-130(1)(a) (West 2020). Until that moment arrives, *if* that moment ever arrives, the minor remains subject to the

protections of the Juvenile Court Act.

¶ 63    Applying the Code of Criminal Procedure, which governs proceedings in criminal court, to a minor who has not yet been charged with an automatic-transfer crime would not only be inconsistent with the plain language of these statutes, as well as with *Pico* and these other decisions; it would create an unworkable rule of law. It would be chaotic and unfair to leave the rights of minors and the duties of law enforcement, during a custodial interrogation, contingent on later decisions by a party that may not even be in the interview room—the authorizing assistant state's attorney, not to mention the court ruling on petitions (in the case of discretionary transfers). The minor's rights and the officers' duties should not be determined retroactively.

¶ 64    When officers interrogate a minor in custody, they are in no position to know with certainty what will come of that interview. They certainly cannot know what crimes the State's Attorney will charge, much less whether they will be crimes subject to an automatic or even discretionary transfer. And of course, if they are subject to a discretionary transfer, they cannot know if (1) the State will choose to petition for that transfer or (2) the judge will grant that petition. Add in the fact that the State may petition for a discretionary transfer "at any time prior to commencement of the minor's trial." *Id.* §§ 5-805(2)(a); 5-810(1)(a); see *id.* § 5-805(3)(a). That could mean months, maybe years, while law enforcement would remain in a legal limbo, unsure of which rulebook to follow, awaiting the outcome of a judge's ruling on a transfer petition. We refuse to believe that the General Assembly created a statutory scheme that would leave police and suspects to guess about their applicable rights and duties during the critical moment of custodial interrogation.

¶ 65     The charging of a defendant is the dispositive jurisdictional trigger for automatic-transfer crimes. Before the charge, a minor enjoys the full protection of the Juvenile Court Act. Once the minor is charged with an automatic-transfer crime, he is excluded from juvenile-court jurisdiction and falls within the jurisdiction of the criminal courts, as in *Morgan*, 306 Ill. App. 3d at 629. See 705 ILCS 405/5-130(7) (West 2020) ("The procedures set out in this Article for the investigation, arrest and prosecution of juvenile offenders shall not apply to minors who are excluded from jurisdiction of the Juvenile Court ***."). It is at that point, and only at that point—post-charging of an automatic-transfer crime—that the Code of Criminal Procedure's provision relating to simplified *Miranda* warnings would apply. See 725 ILCS 5/103-2.1(a-5) (West 2020).

¶ 66     A "charge," or written statement accusing an individual of committing a crime, can be via complaint, information, or indictment. 725 ILCS 5/102-8 (West 2020). Though later indicted, defendant here was initially charged by complaint, sworn to by Officer Daly, on October 20, 2017—two days *after* his custodial interrogation on October 18. As defendant had not yet been charged with first-degree murder at the time of his custodial interrogation, the Juvenile Court Act governed the custodial interrogation here.

¶ 67                                                        2

¶ 68     The next question, again one of statutory construction, is the meaning of the word "minor" under the Juvenile Court Act's provision for simplified *Miranda* warnings. Recall the relevant language: the simplified warnings must be given to any "minor, who at the time of the commission of the offense was under 18 years of age, *** while the minor is subject to custodial

interrogation by a law enforcement officer." 705 ILCS 405/5-401.5(a-5) (West 2020).

¶ 69    Again, there are two time frames here—the minor's age when the crime was committed and his age when subjected to custodial interrogation. The statute is clear on the first time frame; the individual must have been under age 18 at the time the crime was committed. That much is beyond debate; if the individual was *not* under 18 at the time the crime was committed, he could not possibly fall within juvenile-court jurisdiction. See *id.* § 5-120.

¶ 70    The debate here is over the age of the minor at the time of the custodial interrogation. For two reasons, one more dispositive than the other, we agree with defendant that the individual must be under the age of 21 at the time of the custodial interrogation.

¶ 71    The less dispositive reason involves a simple textual interpretation of the language. As noted, the statute makes clear that the "minor" had to be under the age of 18 at the time he (allegedly) committed the crime. But if, as the State argues, the "minor" must be under the age of 18 at the time of the custodial interrogation, too, then why even include that first time frame? Anyone who is being interrogated for a crime while under the age of 18 must also have *committed* that crime while under the age of 18. That entire first clause would be superfluous under that reading, a result we typically try to avoid. *Lane*, 2023 IL 128269, ¶ 10. To avoid superfluity, one would have to interpret the age of the "minor" at the time of the custodial interrogation as being something *other* than under the age of 18.

¶ 72    But the bigger reason, in our mind, removes any possible doubt. Though there is more than one definition of "minor" under the Juvenile Court Act, that act contains a specific definition for the article in which the simplified-*Miranda* warnings are included, article V.

Section 5-105(10) provides that, "As used in this Article," the term "[m]inor means a person under the age of 21 years subject to this Act." 705 ILCS 405/5-105(10) (West 2022). As defined, then, the simplified-*Miranda* statute provides that an individual under the age of 21, who is interrogated about a crime that occurred when that individual was under the age of 18, must be given the simplified *Miranda* warnings. See *id.* § 5-401.5(a-5).

¶ 73    We cannot agree with the State's attempt to avoid this construction. We freely acknowledge that the colloquial use of the word "minor" typically means under the age of 18. See Black's Law Dictionary (12th ed. 2024) (defining "minor" as "[s]omeone who has not reached full legal age; a child or juvenile under 18 years of age"). But the Juvenile Court Act does not use that term colloquially; it is not only a term of art but, at least in some instances in that act, a term of jurisdictional import, recognizing that minors within the juvenile-court system who age beyond their eighteenth birthday will stay within the system until they turn 21. See, *e.g.*, 705 ILCS 405/1-3(10) (West 2022); see generally *People v. Fiveash*, 2015 IL 117669, ¶¶ 12-15.

¶ 74    Most importantly, again, the legislature specifically defined "minor" in the article in which the simplified-*Miranda* provision appears. Even a popularly understood meaning must yield to a statutory definition. *Fiveash*, 2015 IL 117669, ¶ 13 ("When a term is defined within a statute, that term must be construed by applying the statutory definition provided by the legislature."); *People v. Austin*, 2019 IL 123910, ¶ 115 (same); *People v. Chenoweth*, 2015 IL 116898, ¶ 21 (same).

¶ 75    The State passes off two cases as speaking to the issue at hand, but neither does. In *People v. Leanos*, 2023 IL App (1st) 191079, ¶ 116, we noted that the juvenile-warnings

provision (in the Code of Criminal Procedure) did not apply to Leanos because he "had already turned 18." The State divorces this language from all context, ignoring the fact that Leanos was already 18 *when the crime was committed*. *Id.* ¶ 123. Juvenile-court jurisdiction *never* attaches to crimes committed when the individual was 18 or older. 725 ILCS 5/103-2.1(a-5)(1)-(2) (West 2020); see also 705 ILCS 405/5-401.5(a-5)(1)-(2) (West 2020). *Leanos* offers no assistance.

¶ 76    In *In re Jose A.*, 2018 IL App (2d) 180170, ¶ 21, it was undisputed that the 16-year-old respondent was a "minor" for purposes of the juvenile-warnings provision. The court had no occasion to address our question at all. Rather, the issue on appeal was whether a school official who questioned the respondent about a suspected drug offense was a "public official or employee" required by the statute to administer the juvenile *Miranda* warnings. 705 ILCS 405/5-401.5(a-5) (West 2016). The court's discussion is relevant here only to the extent that it set forth the legislative history of the juvenile-warnings provisions. The court found that history to be "of little assistance" on the question presented in that case. *Jose A.*, 2018 IL App (2d) 180170, ¶ 31.

¶ 77    Which brings us to that legislative history, the State's strongest argument. The State correctly points out that legislators supporting passage of the law that created these simplified-*Miranda* provisions spoke of the law's application to individuals under the age of 18. Senator Van Pelt noted that the bill provided for "a simplified version of the *Miranda* warning [to] be given to minors under the age of eighteen." 99th Ill. Gen. Assem., Senate Proceedings, May 5, 2016, at 53-54 (statements of Senator Van Pelt). Similarly, Representative Currie noted that the bill "simplifies the *Miranda* warning for people up to the age of 18 since a lot of research shows that young people don't understand their right to waive their opportunity to have a lawyer or

waive their opportunity to speak." 99th Ill. Gen. Assem., House Proceedings, May 26, 2016, at 87 (statements of Representative Currie).

¶ 78    These statements do not alter our interpretation. When statutory language is clear and unambiguous, we do not resort to legislative history or any other canon of construction; we apply the statute as written. *Whitaker*, 2020 IL 124792, ¶ 16. The provisions at issue are crystal clear in defining "minor" for our purposes.

¶ 79    We would abandon our duty if we allowed unambiguous statutory language to give way to statements in floor debate. We would judicially erase an express statutory definition that unquestionably applies here. And we would assume that the legislature was unaware of that statutory definition in article V when it enacted this law, when we have been repeatedly instructed to presume the very opposite. See *Perry v. Department of Financial & Professional Regulation*, 2018 IL 122349, ¶ 67 (court presumes that legislature was aware of existing statutes); *Skaperdas v. Country Casualty Insurance Co.*, 2015 IL 117021, ¶ 30 (" 'It is presumed that the legislature, in enacting various statutes, acts rationally and with full knowledge of all previous enactments.' " (quoting *State v. Mikusch*, 138 Ill. 2d 242, 247-48 (1990)).

¶ 80    There is nothing else we can say or do about this disconnect. Clearly, one of two things is true: the legislators were wrong in how they described the bill, or they were right, and the legislature made a drafting error, failing to consider that article V of the Juvenile Court Act contained an express definition that unmistakably defined a "minor" as one under the age of 21. Our rules of statutory construction require us to interpret the statute as written, if plain and unambiguous as here. If the legislature truly meant to say something different, it is free to amend

this statute at any time.

¶ 81    We hold that the simplified-*Miranda* provision of the Juvenile Court Act applied to defendant's custodial interrogation, as he had not been charged with a crime qualifying him for automatic transfer at that time. We likewise hold that, as defendant was under age 21 at the time of that interrogation, the officers were required to provide him those simplified warnings.

¶ 82                                                    B

¶ 83    Because officers did not provide defendant with the required simplified *Miranda* warnings, defendant's custodial statement is "presumed to be inadmissible." 725 ILCS 5/103-2.1(a-5) (West 2020). This presumption of inadmissibility "may be overcome by a preponderance of the evidence that the statement was voluntarily given and is reliable, based on the totality of the circumstances." *Id.* § 103-2.1(f).

¶ 84    This framework, with one exception we will mention below, is little more than a restatement of the State's burden on a claim of a garden-variety *Miranda* violation, where the State must show that the defendant's decision to waive his rights and speak to the police was voluntarily, knowingly, and intelligently made. *Maryland v. Shatzer*, 559 U.S. 98, 104 (2010); *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *People v. Braggs*, 209 Ill. 2d 492, 505 (2003); 725 ILCS 5/114-11(d) (West 2024).

¶ 85    We recognize that the statute here only mentions the State's burden to show that the minor's statement was "voluntarily given," without mention of "knowingly" or "intelligently." But you cannot have a voluntary waiver without a knowing and intelligent one; you cannot make a "free and deliberate" choice to waive your rights, and thus a "voluntary" waiver (*Moran*, 475

U.S. at 421), unless you first *understand* what rights you are waiving. See *id.* (valid *Miranda* waiver requires "both an uncoerced choice and the requisite level of comprehension" of rights).

¶ 86     It is for this very reason that our supreme court, in reviewing the Code of Criminal Procedure's provision on motions to suppress confessions, interpreted the State's burden of proving a "voluntary" statement as including the concept of a knowing and intelligent waiver, as well. See *Braggs*, 209 Ill. 2d at 505 ("The concept of voluntariness includes proof that the defendant made a knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel." (citing *People v. Reid*, 136 Ill. 2d 27, 54 (1990)); 725 ILCS 5/114-11(d) (West 2022).

¶ 87     Indeed, considering that the entire point of the simplified *Miranda* warnings arises from the concern that children may not *understand* the "adult" explanation of these rights, it would be absurd to require a knowing and intelligent waiver under the constitution and under the Code of Criminal Procedure but not under the simplified juvenile version. Which means there is literally no daylight between the analysis of a valid *Miranda* waiver under the Juvenile Court Act, the Code of Criminal Procedure, and the constitution. In each instance, if the defendant alleges a violation of *Miranda*, the State bears the burden of proving that the defendant's statement was made voluntarily, knowingly, and intelligently.

¶ 88     Notably, however, the simplified juvenile version adds one more hurdle to the State's burden—it also requires, as a precondition to admissibility, that the State prove that the minor's statement was "reliable." 725 ILCS 5/103-2.1(f) (West 2020). That is unusual, for while voluntariness is always a legal question for the court in determining the admissibility of a

confession, the reliability of the statement is historically a factual question up for debate at trial and resolved by the factfinder. *Crane v. Kentucky*, 476 U.S. 683, 688 (1986); 725 ILCS 5/114-11(b), (f) (West 2022). Of course, the legislature is free to add this requirement as a precondition to admissibility, but we would emphasize that doing so does not (and could not) displace the defense's right at trial to dispute the reliability of the confession, for doing so would almost certainly violate due process. See *Crane*, 476 U.S. at 688.

¶ 89    We then must consider what the statute means when it requires the State to prove that the "statement *** is reliable." 725 ILCS 5/103-2.1(f) (West 2020). Note, first, that this subsection (f) was a part of this statute long before the simplified-*Miranda* language was added in 2017. Before that time, this provision in the Juvenile Court Act only concerned the requirement that the police electronically record certain custodial interrogations with juveniles; the failure to electronically record any such statement rendered evidence of that confession presumptively inadmissible—unless, that is, the State could show, among other things, that the incriminating statement was reliable. See 725 ILCS 5/103-2.1(f) (West 2016).

¶ 90    In *that* context—when an electronic recording was required, but the police did not comply—the question of the statement's "reliability" probably meant the question of whether the minor truly made an (unrecorded) incriminating statement as claimed by the State. And of course, in our case, we know he did; we have an electronic recording of defendant's statement.

¶ 91    But decisions from this court have looked at "reliability" another way as well; even if it is clear (from the ERI) that the minor gave the incriminating statement, by asking whether the statement was "reliable," we are asking whether that statement was *worthy of belief*, as opposed

to a false confession. See *People v. Sanchez*, 2018 IL App (1st) 143899, ¶¶ 77-78; *People v. Harper*, 2012 IL App (4th) 110880, ¶ 34 (noting dictionary definition of "reliable" as "suitable or fit to be relied on: DEPENDABLE" (internal quotation marks omitted)). So in addition to considering whether defendant's statement was made voluntarily, knowingly, and intelligently, we will also consider whether the statement was reliable in this sense.

¶ 92    In determining whether a waiver of a suspect's *Miranda* rights was voluntary, knowing, and intelligent, we consider such factors as the suspect's age, background, and intelligence; the conduct and statements of the interrogating officers; and the general conditions and length of the detention and interrogation. *Braggs*, 209 Ill. 2d at 515; *Leanos*, 2023 IL App (1st) 191079, ¶ 28.

¶ 93    Though reliability and voluntariness inquiries overlap substantially, they are "separate" inquiries, and "[f]actors other than voluntariness have bearing on the reliability of a confession." *Sanchez*, 2018 IL App (1st) 143899, ¶ 78. Corroboration is generally the most important factor for reliability. *Id.* Another key factor, in our view, is whether any interrogation tactics by the police were unduly likely to elicit a false confession—as is true of some, but not all, interrogation tactics that might broadly be labeled "deceptive."

¶ 94    Suppression motions generally present "mixed questions of law and fact," to which we apply the bifurcated standard of review established in *Ornelas v. United States* and first adopted by our supreme court in *In re G.O.*: we review the trial court's findings of "historical fact" under the deferential manifest-weight standard, but we review *de novo* the trial court's determination regarding the ultimate ground for suppression raised in the motion. *Ornelas v. United States*, 517 U.S. 690, 696, 699 (1996); *In re G.O.*, 191 Ill. 2d 37, 49-50 (2000); *Braggs*, 209 Ill. 2d at 505;

*Leanos*, 2023 IL App (1st) 191079, ¶¶ 30-31.

¶ 95    The circumstances of defendant's interrogation are largely undisputed. He was arrested at night, while leaving his girlfriend's house, and brought to an interview room at the station at roughly 11:45 p.m. The detectives allowed him to use the restroom and offered him a drink, which he declined. The interrogation commenced shortly after midnight and lasted just over 90 minutes. During that relatively brief time, as custodial interrogations go, defendant was again offered water, food, cigarettes, and use of the restroom. The detectives did not display any weapons, and there was no evidence of physical or mental abuse.

¶ 96    Although the detectives did not administer the juvenile *Miranda* warnings, they did read defendant his "adult rights." And for what it's worth, they went beyond the standard warnings, adding a clarification of an important point that many suspects likely do not fully understand: "If you chose to talk and then you want to stop talking later on you have that right, okay. You can just say, you know what? I don't wanna talk anymore." Defendant acknowledged that he understood this and every other aspect of the *Miranda* warnings. The day after his interrogation, when the detectives returned to the room with a state's attorney, defendant invoked his *Miranda* rights and declined to make any further statements without counsel present.

¶ 97    Defendant was just barely 18 years old, but as the trial court emphasized, he was a high academic achiever with no known intellectual disabilities or learning deficits. His transcripts showed that he took honors classes, achieved a 4.0 grade point average in some semesters, and was valedictorian of his class. True, his grades slipped in the months leading up to the shooting, as he is keen to point out. But given his demonstrated achievement, one must suspect that this

slip was at least in part a consequence of his focus on drug dealing. In any event, it is hardly evidence that he lacked the cognitive wherewithal to understand his right to remain silent.

¶ 98    The one disputed fact about the circumstances of the interrogation is defendant's alleged lack of sleep. Defendant did not testify at the suppression hearing, but he testified at trial, and now claims on appeal, that he had not slept in over 24 hours, since he had stayed up the entire night smoking cannabis to celebrate his eighteenth birthday. His lack of sleep, he says, is "evident from the ERI"—and in particular, the 21-minute interval, immediately before he admitted to robbing Rayborn, during which he was "relatively unresponsive" to the questioning.

¶ 99    On the other hand, as the State points out, defendant never told the detectives that he had been up for a full day or that he needed sleep. Unlike the suspect in his cited case, *People v. Starling*, 64 Ill. App. 3d 671, 672 (1978), the police did not wake him, take him out of bed, and bring him to the station. By his own account at trial, he was awake, talking to his girlfriend and doing homework, when the police arrested him and brought him in for questioning.

¶ 100   Throughout the interrogation, the State continues, defendant was "coherent and creative enough to concoct [a] detailed story." And we would add that he modified his story on the fly, as the detectives confronted him with new evidence—his fingerprint, in particular.

¶ 101   It is not entirely clear that the interval preceding defendant's admission to the robbery was the result of sleep deprivation. The other possibility, as the State points out, is that defendant was "processing" what had just transpired and weighing his options. That is no light task, for an 18-year-old or anyone else, and we might expect an extended silence and some blank, or even pained, looks. Indeed, if defendant started looking sickly during that interval, as the detectives

- 28 -

noticed, that might very well mark the point at which the gravity of his situation and impending decision struck him with full force. All in all, the evidence that his confession was the product of sleep deprivation is equivocal and thin, at best.

¶ 102    The factors working in defendant's favor, so far, are his young age and the fact that the detectives read him his rights using the adult *Miranda* warnings rather than the simplified juvenile warnings. These factors alone do not warrant suppression, as the overall circumstances tend to show, on balance, "an uncoerced choice and the requisite level of comprehension" required for a valid *Miranda* waiver and a voluntary confession. (Emphasis omitted.) *People v. Bernasco*, 138 Ill. 2d 349, 354-55 (1990) (quoting *Moran*, 475 U.S. at 421). The question that remains is whether the detectives employed post-waiver interrogation tactics that vitiated the waiver or rendered the confession involuntary or unreliable. Which takes us to the heart of defendant's argument: the use of "maximization" and "minimization" tactics during the interrogation.

¶ 103    First, defendant says, the detectives deployed "maximization," a category of "deceptive" tactics in which the police "exaggerate the strength of the evidence" and "emphasize the futility of denials." These particular tactics were intertwined here. The argument, as we understand it, goes like this. The detectives' overarching goal was to impress upon defendant that, in appellate counsel's phrase, they would only "accept" one of two accounts of the shooting: it was either a robbery that went sideways or an intentional murder. But either way, it was futile for defendant to insist that he shot Rayborn in self-defense. And to cajole him into confessing to one (or both) of the preordained offenses, the detectives made "misleading comments about the nature of the

evidence."

¶ 104   To begin, it is vague and overly general to say that the police "emphasize[d] the futility of denials" during an interrogation. This description can mean many things, some potentially coercive, some not. It might, for example, describe the use of thinly veiled threats. But here, as the remarks quoted by defendant make clear, it refers to the detectives' repeated assertions that defendant's story of self-defense was "unbelievable" or "stupid" or "retarded." Intemperate language aside, the point was that defendant's account of the shooting, in which he was robbed and attacked by Rayborn, wasn't adding up. There is nothing coercive about telling a suspect that his story is hard to swallow and confronting him with reasons—real or even hypothesized—why one might be inclined to that point of view. And that is what the detectives did for the better part of the interrogation. So far, their "maximization" tactics seem innocuous enough.

¶ 105   But, the argument continues, some of their supposed reasons for finding defendant's story implausible were fabrications, based on exaggerations of the known evidence. But that alone will almost never vitiate a *Miranda* waiver or render a confession involuntary.

¶ 106   It is well settled that " '[a]rtful deception is an invaluable and legitimate tool in the police officer's bag of clever investigative devices.' " *Leanos*, 2023 IL App (1st) 191079, ¶ 60 (quoting *Leger v. Commonwealth*, 400 S.W.3d 745, 750 (Ky. 2013)). "[T]rickery is not automatically coercion" and generally "do[es] not render a confession inadmissible *** unless government agents make threats or promises." (Internal quotation marks omitted.) *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001). Indeed, "[p]loys to mislead a suspect *** that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Illinois v.*

*Perkins*, 496 U.S. 292, 297 (1990).

¶ 107   Granted, police deception might in principle become so pervasive and obfuscating that a suspect could no longer make a rational choice between speaking and remaining silent. But this is not an extreme case that requires us to explore the outer boundaries of permissible deception. Most of what the detectives told defendant about the available evidence was true. His claim thus rests on two "misleading" remarks: one that overstated the fingerprint evidence and one that falsely implied that the shooting was captured on a surveillance video.

¶ 108   It was true, as the detectives said, that defendant's fingerprint was found on the magazine loaded and locked into place in the handle of the gun. But it was misleading for them to add that "there's no other prints but your print" anywhere on the gun. In truth, there was a second print, also on the magazine, that was not tested (apparently due to ISP's "deferral policy"). So nobody knew whose print that was. And the absence of evidence, as the saying goes, is not evidence of absence. The police were in no position to assert, at least not candidly, that the *only* prints on the gun came from defendant.

¶ 109   Granted, that remark was misleading, to a point. But it was not the kind of consequential fraud that defendant makes it out to be, nor is it of the kind that would potentially render a waiver and confession involuntary. To see why, it will help to put the remark in its broader context. In defendant's story of self-defense, he tussled with Rayborn over the gun. That, he surmised, must be how his print got on it. If so, the detectives countered, Rayborn's prints would also be on the gun. (Maybe, maybe not. Recall that *no* usable prints were found on the outside of the gun. And that is hardly unusual.) Yet Rayborn's prints were nowhere to be found. Or so they

claimed.

¶ 110   In the overall arc of the interrogation, that was a minor point. The real point about the fingerprint evidence was not the *absence* of Rayborn's prints. It was the *location* of *defendant's* print. Defendant's story might make some sense, the detectives told him, if his print were on the outside of the gun. But a tussle could not plausibly explain how his print wound up on the loaded magazine. Defendant then suddenly recalled that the magazine "fell out" during the struggle, and that Rayborn reloaded it during the tussle. So maybe his print got on the magazine then. The firearm examiner's analysis scotched that possibility. And the detectives weren't buying it, anyway: even if the magazine inexplicably fell out, it was hard to believe that anyone, Rayborn or defendant, managed to reload it during the fast-moving, violent encounter that defendant described. Which meant, from the detectives' point of view, that defendant very likely loaded the magazine into the gun *before* he went to Rayborn's apartment building. That, in turn, left "only two plausible explanations. Either [you] went there to rob him or you went there to kill him."

¶ 111   In short, the one misleading overstatement that the detectives made about the fingerprint evidence was made in the service of a minor point. And in any event, the overstatement did not elicit a confession. It elicited an amendment to defendant's story that the police countered with statements about the evidence that were not deceptive at all.

¶ 112   In the other misleading statement, the detectives implied that the shooting was captured on surveillance video: "Did you see the sign in there that said surveillance cameras in use? Did you see that sign?" When defendant said that he did, the detective continued, "[t]hat *** thing about the magazine didn't happen, all right." The "clear implication" of this remark, defendant

says, was that the detectives "possessed surveillance video refuting [his] account," when in fact no such video existed.

¶ 113   If "[t]hat *** thing about the magazine" really did happen, as defendant claimed, then a surveillance video would confirm, not "refut[e]," his story. So if defendant was telling the truth about being robbed and attacked by Rayborn and the magazine falling out of the gun during the ensuing struggle, he should have *welcomed* a surveillance video. A minimally rational suspect who is telling the truth about what happened should always welcome an objective recording of the events. When *that* is the kind of evidence that the police claim to have, misleadingly or not, there is no reason for a suspect to fabricate a story in order to align with it.

¶ 114   Any suspect, including an intelligent 18-year-old like defendant, might of course lose sight of this point in a coercive atmosphere of browbeating and threats. But this was not that kind of interrogation. Implying that there was a surveillance video did not render defendant's waiver and statement involuntary. And this is a perfect example of the kind of police deception that does not render a statement unreliable, either, since it would not tend to elicit a false confession.

¶ 115   That said, one kind of deception *is* strictly prohibited: "notwithstanding all the trickery and deceit that interrogators may, in general, legally and constitutionally employ, the *Miranda* rule imposes an 'absolute prohibition upon any trickery which misleads the suspect as to the existence or dimensions of' the prophylactic rights enshrined in the *Miranda* warnings." *Leanos*, 2023 IL App (1st) 191079, ¶ 44 (quoting 2 Wayne R. LaFave *et al.*, Criminal Procedure §§ 6.2(c), 6.9(c) (4th ed. 2022 Update)).

¶ 116   This kind of deception was on display in *Hart v. Attorney General*, 323 F.3d 884 (11th

Cir. 2003), cited here by defendant. In *Hart*, the suspect asked an officer her opinion "on the pros and cons of hiring a lawyer." *Id.* at 894. The officer responded, " 'I'm going to want to ask you questions and he's going to tell you you can't answer me.' " *Id.* at 888. And she further assured the suspect that " 'honesty wouldn't hurt him.' " *Id.* at 894.

¶ 117    As we explained in detail in *Leanos*, 2023 IL App (1st) 191079, ¶¶ 103-104, the whole point of having counsel present during a custodial interrogation is to protect the suspect's right against self-incrimination, yet the officer in *Hart* explicitly cast that as a disadvantage of having a lawyer. And "honesty," if self-incriminating, obviously *could* "hurt" the suspect, in precisely the sense that the *Miranda* warnings are meant to convey. The officer's explanation in *Hart* thus contradicted the *Miranda* warnings and misled the suspect about his *Miranda* rights, which he evidently did not understand. The *Miranda* waiver in *Hart* was thus invalid.

¶ 118    Defendant formulaically asserts that, as in *Hart*, the detectives "consistently undermined and contradicted [his *Miranda*] rights." But his specific arguments do not even try to substantiate this assertion. And the ERI does not bear it out. The detectives never misled defendant about his *Miranda* rights or the consequences of waiving them. All in all, their "maximization" tactics did not vitiate defendant's *Miranda* waiver or render his statement either involuntary or unreliable.

¶ 119    Second, defendant says, the detectives pervasively used "minimization," a category of tactics "designed to elicit confessions by offering excuses or justifications, suggesting a less odious motivation, or shifting blame to a victim or accomplice." To this end, the detectives set out to paint Rayborn as "an unintelligent lowlife who deserved to be robbed" and then built on this theme by repeatedly suggesting that the "consequences might not be as severe" for defendant

"if he simply owned up to it being a robbery gone bad."

¶ 120   The detectives no doubt tried to convince defendant that, "in *some sense*, it [was] in his interest to confess." (Emphasis in original.) *Leanos*, 2023 IL App (1st) 191079, ¶ 97. Indeed, the efficacy of interrogation "depends upon the ability of the interrogators" to do exactly that, and as long as their methods do not involve any promises or threats, they are generally permissible. *Id.* So if minimization, as defendant understands it, encompasses all efforts to convince a suspect that he would be better off confessing, even when no threats or promises are made, then not all minimization is off limits.

¶ 121   Defendant's argument would get real traction if he meant—and could show—the detectives made an "offer of leniency *** coupled with a suggestion of a specific benefit that will follow if [he] confesses" to a robbery. *People v. Phillips*, 2018 IL App (3d) 130270, ¶ 48 (quoting *People v. Kellerman*, 342 Ill. App. 3d 1019, 1027 (2003)); see also *People v. Henslick*, 2022 IL App (4th) 200481, ¶ 37; *People v. Lee*, 2012 IL App (1st) 101851, ¶ 34. Police efforts to "minimize" the consequences of a *Miranda* waiver in *this* sense are prohibited and weigh heavily in favor of suppressing a resulting statement as involuntary.

¶ 122   For example, in *Phillips*, 2018 IL App (3d) 130270, ¶ 47, defendant's principal citation for this argument, the police told the defendant that "[a] lot of things can change, including that charge, if the truth is brought out. And if it comes out of your mouth." (Internal quotation marks omitted.) That was a promise of a specific benefit: the "clear import" of the statement was that the defendant could avoid a first-degree murder charge by confessing. *Id.* ¶ 51. But here, the detectives made no promise of a specific benefit in any of the numerous remarks that defendant

culls from the ERI in support of his argument.

¶ 123   The set-up for their minimization tactic, as defendant sees it, was denigrating Rayborn and suggesting that he "deserved to be robbed." At first blush, it may appear that the detectives called Rayborn "lazy," a "clown," a "dumb f***," and a "big dopey guy." But in offering these apparent descriptions, they were typically speaking from what they supposed to be defendant's point of view: "[Y]ou go there to f*** stick this dumb f*** up because—what do you care? You don't know this guy and you bring a gun and then shit goes bad." Or: "You went there to f***—I mean he looked—he looked like a big dopey guy—you can get one over on him."

¶ 124   The detectives were not actually suggesting that Rayborn "deserved to be robbed," much less that defendant was legally justified or excused for doing so. They were positing scenarios, as described from defendant's (supposed) perspective, to probe what he would admit to. "Modern police interrogation" is based, in no small part, on "a psychological confidence game" (*Leanos*, 2023 IL App (1st) 191079, ¶ 97), and efforts to get inside a suspect's head, so to speak, are an integral part of it.

¶ 125   Many remarks were designed to convince defendant that it would not be in his own self-interest, going forward, to be perceived as a liar. And if he kept insisting that the magazine fell out of the gun after Rayborn robbed and attacked him, he would look like a liar, indeed, and a cold-blooded murderer to boot: "You got to be realistic right now. You wanna come across as a liar who don't give a f*** about people or do you want to tell the truth and be believable. It was an accident"—or a "mistake," as they said elsewhere—either way, meaning an unintended death resulting from a robbery. An appeal to defendant's own potential interest in confessing, yes; an

improper promise, no.

¶ 126    Various other remarks by the detectives, on the theme of a robbery being "explainable," fall into this same general category. We will not try to sort through them one by one. Suffice it to say that none of them involve a promise that defendant would reap some particular legal benefit—a dismissed or reduced charge, a favorable plea, or anything along those lines—if he admitted that he robbed Rayborn.

¶ 127    Rather, the recurring theme in these remarks can be summed up like this: Self-defense doesn't add up. Your prints are not on the outside of the gun; they're on the loaded magazine. If "you wanna roll the bones on that," it won't go well. You'll be better off, in some general sense, with a story that makes sense and fits with the available evidence. Defendant has not cited, and we are not aware of, any authority that prohibits appeals like these.

¶ 128    Other times the detectives appealed for "a little closure for [Rayborn's] family," just "[s]o they know what happened. Even if it was something silly, something that didn't have to happen but did"—like a robbery gone tragically wrong. Such appeals fall under the rubric of permissible " 'moral [or] psychological pressure to confess.' " *Leanos*, 2023 IL App (1st) 191079, ¶ 97 (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010)).

¶ 129    In defendant's view, the detectives assured him that, "if he simply confessed to a robbery gone wrong, the situation would 'com[e] to an end' and he would no longer have to 'worry[ ] about the police' or 'go on to the next phase' " of the criminal process." As appellate counsel has paraphrased and cobbled together the detectives' remarks, it is starting to sound as if there was an assurance that defendant would avoid charges if he confessed. And that would likely render

the confession involuntary.

¶ 130   So let's take a closer look at their context. The first two (of three) remarks embedded in counsel's paraphrase come from an appeal to defendant to get it all off his chest. It began with this rhetorical question: "Since this happened I mean you've had to be sick to your f*** stomach every f*** day are we right?" Defendant agreed.

¶ 131   The detective continued: "All right the only way you f*** start to f*** feel better—like really feel better without worrying about the police—when the pol—did the [*sic*] think the police were gonna come get you eventually?" Defendant said that he'd assumed they would.

¶ 132   The detective continued again: "And it—it—it's coming to an end where you—you don't have to—you can finally f*** eat a good sandwich or something because you're not gonna have to worry about this f*** every single f***." For if defendant was anything like the detective, he "be f*** nervous as shit every f*** day *** if shit went bad like that."

¶ 133   The detectives didn't promise defendant that he would reap a specific legal benefit if he confessed. They tried to persuade him that he would feel better if he got this off his chest. And an "appeal to the suspect to tell the truth, clear his conscience, and relieve himself of the burden of concealing his misdeeds" is just another form of "permissible moral or psychological pressure." *Id.* ¶¶ 97-98.

¶ 134   The third quotation in appellate counsel's paraphrase—defendant would not "have to ***
'go on to the next phase' of the criminal process" if he confessed to a robbery—came not long after that exchange, but in a different context. The detectives had since returned to their overarching theme: defendant's story, on which his "print magically f*** appear on the inside of

the gun that's locked," is "just f*** impossible." If the facts about the gun and magazine were a bit different, the detective said, "I'd listen to you a little bit longer." But as things stand, if they take his story to their "bosses," they are "just gonna be like uh—okay we can't do anything else for them. Uh—he's gonna have to uh—go on to the next phase of this little operation, you know."

¶ 135   Let's stop there. The detectives are heading into dangerous territory. The "next phase of this little operation" is obviously a criminal charge. So their clear implication is that, if defendant sticks to his incredible story, he will no doubt be charged, and that will be that. Fair enough.

¶ 136   But what if he changes course? Will he avoid charges? The detective continued:

> "But if you say the truth which we both know, we all three of us know what f*** happened. You went there to f***—I mean he looked like a big dopey guy—you can get one over on him. Deante probably told you. But you said you were with him before. Did you ever meet that guy before uhm—."

And with that, the detectives returned again to their main theme, that defendant's story of being attacked by Rayborn and having the magazine fall out of the gun "looks retarded."

¶ 137   Unlike in *Phillips*, 2018 IL App (3d) 130270, ¶ 47, the detectives did not tell defendant that a presumptive murder "charge *** could change" if he confessed. They stopped just short of telling him that he would avoid "the next phase" if he confessed to a robbery. What they told him was that a robbery gone bad was something that people might be able to "understand *** better" than a cold-blooded murder. But that didn't mean he wouldn't be charged. The detectives came about as close as they could without actually extending a false promise of a specific benefit.

¶ 138   Tactics like this, where an officer inches ever so closely to prohibited territory, with an 18-year-old suspect, give us pause. But the law has to draw clear lines for the police and make them stick. By the slimmest of margins, that line was not crossed here. The interrogation tactics did not vitiate defendant's *Miranda* waiver or render his confession involuntary.

¶ 139   Nor, for the reasons we have given, were they the kind of tactics that, in our view, were unduly likely to induce a false confession, rendering the confession unreliable. And we have already recounted that the evidence in this case corroborated defendant's incriminating statement. Defendant has pointed to nothing else in particular, nor have we found anything, that would remotely point to the confession as being unreliable in the sense that we might view it as a false confession.

¶ 140   Because the State carried its burden of proving that defendant gave his incriminating statement voluntarily, knowingly, and intelligently, and because the State proved that the statement was reliable, the confession was properly admitted, notwithstanding the police's failure to read defendant his simplified *Miranda* warnings.

¶ 141                                                                      II

¶ 142   Defendant was arrested without a warrant. There is no dispute that the arrest was made in a public place, was supported by probable cause, and thus complied with the fourth amendment. But relying on the vacated portions of *People v. Bass*, 2019 IL App (1st) 160640, *aff'd in part & vacated in part*, 2021 IL 125434, and *People v. Smith*, 2022 IL App (1st) 190691, defendant initially argued that a warrantless arrest—with or, here, without a pending investigative alert— violates the search-and-seizure clause of the Illinois Constitution. He thus seeks suppression of

his custodial statement, as the product of his allegedly illegal arrest. Because he did not raise this issue in his motion to suppress, he seeks this relief on theories of plain error and ineffective assistance of trial counsel.

¶ 143   As defendant acknowledged in a supplemental motion to this court, our supreme court recently settled this issue in *People v. Clark*, 2024 IL 127838, a case decided after this appeal was briefed. In short, *Clark* rejected the reasoning of *Bass* and *Smith* and squarely held that "warrantless arrests for felonies do not violate the Illinois Constitution" when they are based on probable cause. *Id.* ¶ 63. As defendant now concedes, because defendant's arrest was constitutional under *Clark*, he cannot show that the denial of his motion to suppress was (plain) error or the result of ineffective assistance of counsel.

¶ 144                                                    III

¶ 145   Defendant alleges that the trial court erred in excluding evidence of several "violent and frightening" posts that he claims to have seen in Rayborn's Instagram feed before the shooting. He argues that this was not only evidentiary error, and thus an abuse of discretion, but also a denial of his constitutional right to present a defense. See *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *People v. Jones*, 2024 IL App (1st) 221555, ¶ 62.

¶ 146                                                    A

¶ 147   The posts at issue date from 2014, about three years before defendant shot Rayborn. They were posted under "Rate YK," the name Rayborn used when performing as an aspiring rap artist. The posts depict the following text and images:

"SERVE EM OR ROB EM," superimposed over a person's torso, with the

caption, "Keep playing wit my $$$ I'm just gunna take yo shit cuz if I make no $$$ n***a I'm take you $$$ n***a."

"I AVOID DRAMA SO I WON'T HAVE TO SHOOT NOBODY," with the caption, "I'm just saying keep f***n around wit who don't f*** around n u gunna be laying down."

A photo of a man pointing a gun, with the caption, "Have cartel add 32 shot to ur body!!!"

A photo of seven guns, barrels pointing forward, as if toward the reader, with the caption, "About to start firing at these fufu in a week!!!"

Several other posts with photos of guns, one of which is captioned, "in a blink of an eye I'll pull that bitch without thinking."

¶ 148    Defendant moved *in limine* to admit these posts as support for his affirmative defense of self-defense. They were admissible for this purpose, the motion alleged, under *People v. Lynch*, 104 Ill. 2d 194 (1984), codified in part as Illinois Rule of Evidence 405(b)(2) (eff. Jan. 1, 2011). In response, the State dismissed the intentional and strong-probability murder counts, thus leaving felony murder, predicated on armed robbery, as the sole theory of murder on which the jury would be instructed. And because self-defense is not an affirmative defense to a felony-murder charge, the State argued that there was no longer any basis for admitting this evidence. *People v. Moore*, 95 Ill. 2d 404, 411 (1983) ("self-defense cannot be used as a defense to a charge of felony murder"); see *People v. Coleman*, 2023 IL App (2d) 220008, ¶ 39; 720 ILCS 5/7-4(a) (West 2022).

¶ 149    The defense continued to maintain that the Instagram posts were admissible—for one, as *Lynch* evidence, notwithstanding the dismissal of all but the felony-murder counts, and in any event as proof of defendant's state of mind. Analyzing the posts as *Lynch* evidence, the trial court agreed with the State that there was no basis to admit them, as defendant would not be entitled to a jury instruction on self-defense.

¶ 150    This ruling was error, defendant says, because Rayborn's Instagram posts were "relevant for a purpose *other* than *Lynch* evidence," namely, to support his theory "that the State could not prove the predicate felony of armed robbery." To this end, defendant argues that the posts were relevant and admissible for three specific purposes: (1) to explain "why he reacted the way he did when Rayborn attacked him"; (2) to lend credence or "credibility" to his testimony that Rayborn tried to rob *him*, not the other way around; and (3) to explain his "mental state," by which he means, "why he brought a gun to the transaction."

¶ 151    The first two evidentiary purposes on defendant's list are nothing but the two *Lynch* bases in hopelessly thin disguise. So we will analyze them, as the trial court did, under that framework. We agree with its ruling that the Instagram posts were not admissible here under either *Lynch* basis. Nor were the posts admissible to show defendant's "mental state."

¶ 152                                              B

¶ 153    First up is defendant's claim that Rayborn's Instagram posts were admissible to explain "why [defendant] reacted the way he did when Rayborn attacked him." Or, to put a somewhat finer point on it: they explain why he resorted to deadly force, in response to the mere fisticuffs initiated by Rayborn (according to defendant's testimony, that is). The "explanation" defendant

offers, obviously enough, is his awareness, gleaned from the Instagram posts, of Rayborn's "penchant for firearms and willingness to engage in violence."

¶ 154   This is exactly the first *Lynch* basis for admitting evidence of the victim's violent history. The defendant's awareness of that history "necessarily affects his perceptions of and reactions to the victim's behavior." *Lynch*, 104 Ill. 2d at 200. From the defendant's point of view, it may thus seem reasonable to resort to "[t]he same deadly force" that might otherwise seem unreasonable in the same circumstances. *Id.*; see also *People v. Degrave*, 2023 IL App (1st) 192479, ¶ 56.

¶ 155   The reasonableness of defendant's reaction is ultimately a question about the justification of his use of deadly force in response to Rayborn's alleged attack. But the felony-murder charge did not require the jury to decide this question. The State was only required to prove that defendant committed or attempted to commit a forcible felony and that, in the course thereof, defendant or someone else foreseeably caused the death of an individual. *Coleman*, 2023 IL App (2d) 220008, ¶ 39; 720 ILCS 5/9-1(a)(3) (West 2022).

¶ 156   As the trial court correctly observed, if the jury believed defendant's testimony that Rayborn attacked him while he, defendant, was trying to conduct a peaceful (albeit illegal) transaction, then the jury should have found him not guilty of armed robbery and felony murder without further ado—because the evidence, as the jury believed it, would have shown that defendant never intended to commit an armed robbery, the predicate felony. And that would be true even if the jury thought that defendant reacted with disproportionate, unjustified force. In either event, the jury would have found that defendant did *not* act with the requisite intent to commit armed robbery, the only state of mind relevant here. See *People v. Walker*, 392 Ill. App.

3d 277, 287 (2009).

¶ 157   So the trial court and the State are correct, to this extent: when the jury is not instructed on self-defense, the first *Lynch* basis does not apply. The jury does not need to decide whether the defendant's reaction to the victim was justified. Evidence offered to show that the reaction seemed reasonable from the defendant's perspective, given his awareness of the victim's history of violence, is therefore irrelevant. Rayborn's Instagram posts were not admissible to show why defendant "reacted the way he did" to Rayborn's alleged attack.

¶ 158                                                    C

¶ 159   Next, defendant argues that the Instagram posts were "relevant to the jury's assessment of [his] credibility and testimony"—specifically, his testimony that Rayborn tried to rob *him*, not the other way around.

¶ 160   There is only one way in which Rayborn's posts, from three years before the shooting, could conceivably lend any credence to defendant's account of events. And that is by means of a propensity inference: the posts reveal Rayborn's "penchant" for guns, violence, and even robbing his customers. (Recall the post, "SERVE EM OR ROB EM.") This "penchant" makes it more likely that Rayborn tried to rob defendant and thus supports defendant's account of the shooting in his testimony.

¶ 161   This argument is nothing if not the second *Lynch* basis, which allows a defendant to offer "evidence of the victim's propensity for violence" "to support the defendant's version of the facts where there are conflicting accounts of what happened"—or, in other words, "to show who was the aggressor," when this fact is in dispute. *Lynch*, 104 Ill. 2d at 200.

¶ 162   The second *Lynch* basis is codified in Illinois Rule of Evidence 405(b)(2) (eff. Jan. 1, 2011): "In criminal homicide or battery cases when the accused raises the theory of self-defense and there is conflicting evidence as to whether the alleged victim was the aggressor, proof may also be made of specific instances of the alleged victim's prior violent conduct."

¶ 163   Defendant must comply with the requirements of Rule 405(b)(2) if he seeks to offer the Instagram posts as "penchant" evidence; no other rule will even arguably allow the posts to be admitted for this purpose. The rule allows a defendant to offer proof of "specific instances of the alleged victim's prior violent conduct." *Id.*

¶ 164   Rayborn's posts do not qualify; they are not records of any violent acts that Rayborn performed in real life—for example, videos or photos of him shooting or robbing anyone. Sure, Rayborn is *talking* about such things in the posts, but that is expression, not violent conduct.

¶ 165   Whatever these posts may be—an aspiring rap artist striking a pose on social media, perhaps—they are not competent evidence, within the requirements of Rule 405(b)(2), that Rayborn actually committed any violent acts at all, much less that he had a specific history of robbing his customers. So even if defendant did not have the additional problem complying with Rule 405(b)(2)—that he was not pleading self-defense—this evidence would not be admissible, anyway.

¶ 166                                    D

¶ 167   The last evidentiary purpose on defendant's list is the only one that is truly independent of the *Lynch* rule. The posts "influenced [defendant's] state of mind going into the transaction," and in particular, they explain "why he brought a gun." The explanation, of course, was that he

perceived a need to protect himself from the violence that Rayborn might unleash.

¶ 168   The more "violent and frightening" defendant makes the posts out to be, the harder it is to believe that he actually saw them before arranging and heading into the fateful drug transaction with Rayborn. But his motion claims he did, so we will assume as much for argument's sake.

¶ 169   Filled out, in more concrete detail, defendant's claim is something like this. He not only saw Rayborn's posts before the shooting, but he took them literally, not as bluster or posturing. Despite actually meeting Rayborn and peacefully doing business with him twice, defendant concluded from the posts that Rayborn cut a terrifying figure. He might "serve" you or "rob" you, as he pleased. He will "take you $$$" or "take yo shit." He will "add 32 shot to ur body," and do it "without thinking." He will even invite you to his own apartment building to do it right then and there. You can be that brazen when you "[h]ave cartel."

¶ 170   Defendant had a handful of other cannabis sources, as he testified, but he didn't think to do business with them instead of Rayborn. Flowers, their mutual acquaintance, had facilitated two peaceful transactions, but defendant didn't want to bring him along this time, even knowing what he did about Rayborn. Nor did he keep the stakes low, despite harboring a general fear, as he testified, that a "larger" cannabis purchase, like this one, could lead to violence. No, defendant instead upped the ante, arranging to buy three times as much cannabis from Rayborn as he did the first time; and he would go it alone, without Flowers. He would forgo other alternatives and risk life and limb. He just needed to bring his gun.

¶ 171   Not the most convincing explanation. The best thing it has going for it, perhaps, is that late-teenage boys can be known to make bad decisions. But dubious explanations aside, this

state-of-mind theory has more immediate problems.

¶ 172   Here's one that whittles down the scope of any error that defendant could hope to show. Even without Rayborn's posts, the jury knew from defendant's testimony that defendant perceived a general need for protection when he made "larger" cannabis purchases. Defendant testified that he bought the gun, and brought it with him that night, for this very reason. (And because it was "cool.") That scotches his claim of constitutional error. Defendant was not denied "a meaningful opportunity to present his defense;" at worst, he complains of an "evidentiary ruling that limited only a discrete piece of evidence" offered to support the defense, or an aspect of the defense, that he presented. *People v. White*, 2017 IL App (1st) 142358, ¶ 30; see *Jones*, 2024 IL App (1st) 221555, ¶ 62. But defendant has not even shown ordinary evidentiary error.

¶ 173   Again, in a felony-murder case, there is only one question about the defendant's "state of mind" that the jury ultimately must answer: whether the defendant acted with the mental state(s) required by the predicate felony. See *Walker*, 392 Ill. App. 3d at 287; 720 ILCS 5/9-2(a) (West 2022). To prove defendant robbed (or attempted to rob) Rayborn, the State had to prove he used or threatened force to knowingly take property from him. 720 ILCS 5/18-1(a), 18-2 (West 2022). The force had to be used with intent to achieve the taking, and the taking had to be knowing. Rayborn's posts do not speak directly to either mental state.

¶ 174   Defendant either robbed Rayborn or he didn't. That is all the jury had to decide. And the robbery didn't need to be premeditated; defendant didn't need to show up, gun in hand, with this purpose already in mind. He could have decided to rob Rayborn only after he got there (when the flesh-and-blood Rayborn, an unarmed man in flip-flops, showed up in place of the Instagram

persona). If so, whatever reason he may have had for bringing the gun in the first place was now irrelevant. And this is not even our own hypothetical. This is what defendant told the detectives after he was arrested: the robbery was an on-the-spot decision.

¶ 175   In short, even if defendant originally brought a gun out of fear, and thus a perceived need for protection, this "state of mind" does not negate any element of the State's burden of proof. Does this "state of mind" make it *any* less likely that defendant robbed Rayborn? That would be enough for relevance, low threshold that it is. See Ill. R. Evid. 401 (eff. Jan. 1, 2011). We are not so sure. But any relevance would be marginal at best. Defendant's testimony about the general fear he harbored of "larger" transactions only diminishes any potential relevance even further.

¶ 176   Any marginal probative value of the posts would have been substantially outweighed by the risk of unfair prejudice to the State and confusion of the issues for the jury. See Ill. R. Evid. 403 (eff. Jan. 1, 2011). We cannot know what the jury would have made of Rayborn's posts, but there is a clear and obvious risk that the defense would have effectively put Rayborn's character at issue—both in general, by casting aspersions on him, and in the specific sense of painting him as the likely aggressor who initiated the violence—through evidence that was not competent or admissible for these purposes. See Ill. R. Evid. 404(a)(2), 405(a), 405(b)(2) (eff. Jan. 1, 2011). It is reasonable to conclude that this risk substantially outweighs any minimal probative value the posts may have for demonstrating defendant's "state of mind" in the sense he has specified. The Instagram posts thus fail Rule 403 balancing and could properly be excluded on this basis.

¶ 177                                                IV

¶ 178   Defendant argues that the trial court erroneously considered the proceeds of the armed

robbery—the cannabis he took from Rayborn—as "compensation for committing the offense" and thus based his sentence, in part, on an improper aggravating factor. 730 ILCS 5/5-5-3.2(a)(2) (West 2022). Because this point of error was not raised below, defendant seeks a new sentencing hearing on alternative theories of first- and second-prong plain error, as well as ineffective assistance of trial counsel.

¶ 179    Whether the trial court relied on an improper aggravating factor in imposing a sentence is a question of law that we review *de novo*. *People v. Chaney*, 379 Ill. App. 3d 524, 527 (2008).

¶ 180    The proceeds of an armed robbery do not qualify as "compensation for committing the offense," within the meaning of this aggravating factor. The "compensation" factor applies only to a hired gun, so to speak, "a defendant who receives remuneration, other than proceeds from the offense itself, to commit a crime." *People v. Conover*, 84 Ill. 2d 400, 405 (1981).

¶ 181    The supreme court thus held in *Conover* that the "compensation" factor does not apply to the proceeds of a burglary or a theft; because the receipt of proceeds is generally "implicit" in these offenses, it is already factored into the sentencing ranges established by the legislature. *Id.* at 404. That is equally true of a robbery, armed or otherwise. *People v. Vue*, 353 Ill. App. 3d 774, 782-83 (2004). Thus, the cannabis that defendant took from Rayborn was not "compensation" for committing the armed robbery—or the (felony) murder.

¶ 182    Turning to the topic of "aggravation," the trial court found it "appropriate" to make "a couple of comments" about "the circumstances sort of surrounding the offense." And one of the circumstances was this: "The defendant was compensated for his offense because he was then able to take the cannabis, which was a significant amount. I can't remember [what] the dollar

amount exchanged was, but it was significant. He was able to take that without having to pay for it, and that's what he did."

¶ 183   If this remark (and one other like it) were all we had to go on, we would have to conclude that the trial court applied the "compensation" factor to the cannabis. That would be error—and clear and obvious error at that. But in determining whether the trial court applied an improper factor, "we focus on the entire record as opposed to a few words or statements" read in isolation. *People v. Valadovinos*, 2014 IL App (1st) 130076, ¶ 47. To our eye, the trial court used the term "compensation" as an inappropriate label for a set of perfectly legitimate considerations about defendant's conduct and culpability that the court went on to explain. The misnomer aside, the trial court did not base defendant's sentence on an improper aggravating factor.

¶ 184   The trial court soon returned to this theme, reiterating that defendant received cannabis worth "a significant amount of money" as "compensation *** for committing this offense." But this time, the court's surrounding remarks gave context to this observation. The court was in the midst of discussing "something *** that really struck a nerve about *** defendant's intentions." And his intention was "to be [a] big shot cannabis dealer at his high school." Granted, defendant "probably" did not "contemplate" that Rayborn would "die" as a result of the armed robbery, but he did think this: "I'm going to get all this free weed that I can then go sell at the high school and be a big shot because I won't have to pay for it. So everything's a profit."

¶ 185   It was in this context that the trial court repeatedly came back to a "very significant" and "very troubling" point. Defendant's cannabis business allowed him to live a flashy lifestyle and "drive around in [a] Cadillac," the most glaring "symbol of [his] successful dealing." (For what

it's worth, defendant testified at trial that his mother bought him the car. But even taking that as true, it doesn't completely vitiate the trial court's point. It was clear enough, from defendant's own testimony, that he was making good money selling cannabis.)

¶ 186   Defendant's profits and lifestyle, in turn, "enabled" or empowered him to engage in recklessly violent conduct, a brazen armed robbery that left a man dead. It is telling that the trial court made this point while discussing "the *Miller* factors" pertaining to defendant's youth and corresponding immaturity: in a nutshell, defendant was blind to the foreseeable consequences of his actions. See *Miller*, 567 U.S. 460. Of course, his youth was likely a big reason for this failing, but so too was his desire to maximize his profit. That's why his "compensation" was so salient: it showed just how caught up defendant was in his cannabis business and how mindlessly he pursued its spoils. At least that's how the trial court saw it.

¶ 187   From the trial court's perspective, the fact that defendant took (and set out to take) the cannabis for free thus appeared relevant to the court's assessment of his overall culpability for Rayborn's death. (It also meant that defendant's testimony—that Rayborn tried to rob *him*—was "farcical" and "completely lacking any credibility.")

¶ 188   That conclusion was not error, though the free cannabis that defendant sought, and took, should not be called "compensation for committing the offense." The trial court "may properly consider a defendant's efforts to maximize profits from a drug enterprise," despite the fact that the receipt of proceeds is inherent in the crime, "to the extent that such evidence reflects on the nature of the crime." *People v. M.I.D.*, 324 Ill. App. 3d 156, 159-60 (2001); see also *People v. Rios*, 2011 IL App (4th) 100461, ¶ 15. Both *M.I.D.* and *Rios* applied this point to sentencing for

drug possession and/or delivery offenses, but it applies equally to the armed robbery here.

¶ 189    A defendant's efforts to maximize drug profits may bear on a range of entirely "proper sentencing considerations," such as "the extent and nature of a defendant's involvement in a particular criminal enterprise, a defendant's underlying motivation for committing the offense, the likelihood of the defendant's commission of similar offenses in the future and the need to deter others from committing similar crimes." *M.I.D.*, 324 Ill. App. 3d at 159; *Rios*, 2011 IL App (4th) 100461, ¶ 15.

¶ 190    And when the trial court considers the defendant's efforts to maximize drug profits for legitimate purposes like these, the fact that the court incorrectly labeled them "compensation" is not a reason to reverse its sentence, based as it is on proper considerations. See *M.I.D.*, 324 Ill. App. 3d at 160 (court "specifically mentioned defendant's receipt of compensation," but "judge's comments show that he considered the profits from defendant's criminal enterprise as bearing on the nature of the offense"); *Rios*, 2011 IL App (4th) 100461, ¶ 17 (trial court "listed the receipt of compensation when mentioning the statutory aggravating factors" but was really discussing, among other things, the defendant's "underlying motivation for committing the offense, and the nature of the offenses").

¶ 191    Here, what the trial court called defendant's "compensation" brings into focus the nature or character of his offenses, and in particular, his underlying motive—his "intentions," in the trial court's phrase—for committing them. And it was part of a broader course of conduct that, along with his youth, left him blind to the consequences of his decisions and thus speaks to his overall culpability for Rayborn's death.

¶ 192   The trial court was well within its rights to consider these points. It should not have used the statutory phrase "compensation for committing the offense" to refer to the operative fact: that defendant wanted the cannabis for free, to make as much money as he could, and so he did what he needed to do get it, without due regard for the foreseeably lethal consequences. But the mis-citation of the "compensation" factor was harmless. Defendant's sentence was based on proper considerations, and he does not challenge it as inherently unreasonable or an abuse of discretion. Defendant's sentence is thus affirmed.

¶ 193                                CONCLUSION

¶ 194   The judgment of the circuit court is affirmed in all respects.

¶ 195   Affirmed.

---

### *People v. Chavez*, 2025 IL App (1st) 221601

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CR-16291; the Hon. James Michael Obbish, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Hannah Lazar Pieterse, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Brian K. Hodes, Tasha M. Kelly, and Leslie Billings, Assistant State's Attorneys, of counsel), for the People. |

---